# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CT-00761-SCT

*JAIRUS COLLINS a/k/a JAIRUS J. COLLINS*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2013 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| ATTORNEY FOR APPELLANT: | MICHAEL ADELMAN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MELANIE DOTSON THOMAS |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED- 08/20/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Jairus Collins was convicted of murdering Ebony Jenkins.  He appealed, alleging several points of error, and the Court of Appeals affirmed.  Finding that Collins's statement to police should have been suppressed and that one of the State's witnesses should have been qualified as an expert prior to giving opinion testimony regarding the locations of Collins's and Jenkins's cellular phones, we reverse the judgments of the Court of Appeals and the Forrest County Circuit Court and remand the case for further proceedings.

# FACTS AND PROCEDURAL HISTORY[1]

On December 9, 2011, Ebony Jenkins's body was discovered behind a building in Hattiesburg, Mississippi. During the course of their investigation, police officers identified Collins as a suspect in Jenkins's murder. In November 2012, a grand jury indicted Collins as a habitual offender for Count I, the murder of Jenkins, and Count II, possession of a weapon by a convicted felon. The circuit court granted Collins's motion to sever the offenses charged in his indictment.

*Collins v. State*, 2014 WL 4977498, at *1, No. 2013-KA-00761-COA, at ¶2 (Miss. Ct. App. Oct. 7, 2014).

¶2. Prior to trial, Collins moved to suppress the majority of his statement to the police, arguing that everything after he requested an attorney should be suppressed. The entire transcript of the statement to police regarding Collins's request for an attorney and the re-initiation of the interview is as follows:

Jairus: I can stop talking right now? And ask to speak to a lawyer?

Sims: you, you can choose that, but I wouldn't do that - but I mean

Jairus: why . . . why wouldn't I

Sims: well – well that's your constitutional right, just like I read them to ya, that's your constitutional right, if you want to do that, that's fine

Jairus: alright

Sims: but, like I said, if you ain't got – if you ain't done nothing wrong, you ain't got nothing to hide

Jairus: I ain't done nothing wrong

Sims: (inaudible)

---

[1]A portion of the recitation of the facts is taken verbatim from the Court of Appeals opinion.

2

Jairus: How do I know if I'm

Sims; –. that's what I'm say'n, that's why I – I'm told a lot of people in here ain't done nothing wrong, that was completely truthful with me, and gave me everything, and they talk to me without a lawyer, and then and they ain't done nothing wrong, so they walk right out of here.  And if that's, that's the case here then that's what

Jairus: –. That's why I asked to speak to a lawyer, I can't walk out of here

Sims: I'm not saying that either, I'm just saying if you ain't got nothing to hide why – I mean why you going to wait?  Cause we trying to get to the investigation, to figure out what happened

Jairus: right.  I just rather speak to a lawyer. (low voice) rather speak to a lawyer.

Sims: ok

(Detectives get up to leave the room)

Jairus: what I do now?

Sims: sit here

(door closes)

(Time lapse - Approximately five minutes)

(Jairus gets up, knocks on door)

(Detective Scott opens door)

Scott: yes'sir

Jairus: hey (inaudible) everything (inaudible) but, I can just call and get my lawyer, he can be present, I going to tell ya'll everything, . . . I don't need a lawyer, don't need a lawyer . . . .

Scott: ok, It's going to be just a few minutes alright

Jairus: alright.  Because, I'm gonna need to know, because I'm going to call

3

to see if I've got to go to work, I go to work

Scott: alright, I'll get you in here in a second ok, (Scott continues to walk into room)

Jairus: the thing is officer I

(Scott and Jairus sits down)

Scott: – alright man, sit down, I'm just going to sit here and listen.

Jairus: [redacted]. I don't know what's going on, but I mean there's some strange stuff going on even before this stuff happened with ahh what's her name, Eve? Even before . . .there's been some strange stuff going on but, (faintly) dang, I don't know what's going on and I mean

Scott: I'll be more than happy to talk to you, but I can't right now

Jairus: right

Scott: you know, but you know if you want to talk man, I'll sit right here and listen

Jairus: (inaudible) when can they, how long they going have to hold me for the the questioning and talking?

Scott: well I mean right now like I said, we can't do nothing because you said you wanted your lawyer

Jairus: umm hmm

Scott: you know, It's going to be a little bit, then you can, you know, we'll, we'll do something, ok?

(Jairus strumming his finger on the table)

Scott: but like I said man I can't – that's your right you know, you don't want to talk I

Jairus: –. . . . you ask me about guns and all of that

Scott: let me ask you something. If I didn't ask you about a gun would you

4

talk to me?

Jairus: huh? I mean, what I'm gonna get investigated for a gun?

Scott –. Oh now, what we're doing -- we just trying -- remember -- we trying to narrow everything down and push everything out of the way that's not involved and

Jairus: I mean with something like that, that's something (shaking head)

Scott: like I said man

Jairus: –. That's something like – when you – alright I don't live in that area. But I got people I care about in that area and people ya know, then when you got stuff that's going on – alright we all getting together even – ya'll, ya'll ain't the only ones getting together, cause my little brother – like we done hung out with this person.  I don't know this person like that

Scott: umm hmm

Jairus: not myself

Scott: well look

Jairus: –.  But ya'll ain't the only ones getting together and trying to find out what's going on, you got – when you got stuff like that going on you got everbody out there don't know what's going on with everybody looking at each other don't know if it is this or you know everybody – don't nobody know what's going on and when – in a situation like that, when it coming up – coming up it ain't the same I mean you got two different . . .

Scott: I understand.  Well look

Jairus: –. you got people to worry about, people that you know and I know I ain't – when I don't know nothing I don't know what's going on I don't know who to trust or who to (inaudible)

Scott: I can promise you this, you can trust us

Jairus: yeah I know that, I know that

Scott: yeah you, you talking about up on the streets and stuff

Jairus: yeah I know (inaudible)

Scott: let me ask you this. Would you talk to me we just sit here and talk?

Jairus: yeah, yeah I can talk

Scott: I mean now listen, you – when you

Jairus: –. I can tell you what I know

Scott: wait now, hold up man, before we even – I can't – like I said, I have to do the miranda form over

Jairus: right

Scott: if you wanna talk to me

Jairus: yeah

Scott: we'll just sit here and talk and make casual conversation

Jairus: yeah, and then what, then what

Scott: –. I mean look just – we rule you out, we rule you out you gone. ok?, no big deal. That's what we're doing man, we just – we're talking to everybody

Jairus: yeah

Scott: ok, I mean if you want your lawyer then you know, I – that's that's your decision, that's your right. If you wanna a [sic] just sit here and talk to me just what you know, tell me

Jairus: that that's what I wan [sic] to do I mean can I do that without . . . tell you what I know, cause the questions man you keep asking me questions that don't really like

Scott: –. Hey, if you want to do that, let me get another form, we'll talk and I'll let you talk

Jairus: alright I'll do that

6

Scott: how about that.  Alright give me just a second

(Detective Scott leaves the room)

(Detective Scott re-enters the room)

Scott: so you say you'll talk to me without your lawyer

Jairus: yeah, I'll sit up here and talk . . .

Scott: Just tell me like, like you said man, what you know

Jairus: man

Scott: –.  What'cha hear, what'cha know

Jairus: like, to be honest with you man, the reason I said and brought anything up . . . . the fact that I ain't got, I ain't got nothing to hide, I just wanted to tell you what I feel like can help you or or as far as when it comes down to guns and this and that, I don't, wanna get involved and put myself in some stuff that I don't even know what's going on, you feel me?

Scott: well I mean do you have a gun?

¶3.     Scott never administered a new ***Miranda***[2] warning to Collins, as he stated he would, and as Collins acknowledged would happen.  In his testimony at the suppression hearing, Scott testified regarding Collins's "initiation" of conversation that:

> A. . . . Mr. Collins knocked on the door, and I went to see what he needed and that's when I went back in the room.
> Q. So was this contact initiated by Mr. Collins?
> A. Yes, sir.
> Q. And did he initiate the questioning starting again?
> A. Yes, sir.

He further testified that this original "initiation" of contact by Collins was that:

> Q. . . . And then Mr. Collins – he knocked on the door; is that correct?

---

[2]***Miranda v. Arizona***, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

A. Yes, sir.

Q. Okay. And did he ask you at that point how long – did he indicate to you that he didn't know what was going on and wanted to know how long it would be going on – something to that effect?

A. Something like that, yes, sir.

¶4. Later in the interview, Collins again requested a lawyer, stating "ok, I'm gonna tell you this right now, not today, I mean, I need to talk to a lawyer, because I can't – I know ya'll ain't fixing to let me go man." That request for a lawyer was completely ignored (Detective Scott responded with "no listen. I mean, did she try to rob you") and the interview continued. Even later in the interview, Collins stated "I do it, but I do it with a lawyer. I need a lawyer man. I know better than that . . . ." Again, the interview continued. The trial court ultimately denied the motion to suppress, because a short period of time had elapsed between the officers administering the *Miranda* warning to Collins and the continued contact with police after the invocation of his right to counsel, and because "[t]he officer left the room, and then the defendant initiated contact with the officer."

At Collins's murder trial, the State called Louis Dixon, Jenkins's father, as a witness. Dixon testified that he drove to Hattiesburg and filed a missing person's report after receiving a telephone call that his daughter failed to report to work. On the same day that Dixon filed the report, the Hattiesburg Police Department received a phone call about a homeless person sleeping behind a daycare. When police officers arrived at the scene, they discovered the person was actually Jenkins, who had died as a result of two gunshot wounds.

The jury also heard testimony from Craig Mitchell, who lived in a house behind the daycare. Mitchell testified that on the night of December 7, 2011, he was smoking a cigarette on his porch when he heard three or four gunshots. Mitchell testified that the gunshots sounded very close, and he immediately locked himself inside his house and peered out the window. According to Mitchell's testimony, he saw a man running away from the area. Mitchell

8

testified that the man was of medium build and wore a "hoodie-type sweater" that was "[e]ither blue or light gray or black."

The State showed Mitchell a gray sweater belonging to Collins that police officers discovered in the woods. As later testimony revealed, police officers found the sweater wrapped around the suspected murder weapon in a bag hidden in the woods. Upon seeing the gray sweater, Mitchell testified that he was "[p]retty positive" that it was the same sweater he saw the man wearing the night of December 7, 2011.

The State also called Jenkins's friend, Jessie Miles, as a witness. Miles testified that he and Jenkins spoke around 9:30 p.m. on December 7, 2011, about riding to work together the next morning. However, Miles testified that Jenkins failed to show up at work the next day. Miles also provided testimony regarding a gun that he bought in February 2010. According to Miles's testimony, he began experiencing problems with the gun and Collins's brother, Joshia, told Miles that Collins could fix the gun. Miles testified that he gave the gun to Collins around November 2011 after Collins confirmed that he could repair the gun. During Miles's testimony, the State showed him an exhibit, which Miles identified as the gun he bought and gave to Collins to repair. Although the gun's serial number was no longer visible at the time of trial, Miles testified that the serial number had been clearly visible when he gave the gun to Collins in November 2011.

Collins's father, Melvin, also provided trial testimony about the time period surrounding Jenkins's murder. Melvin testified that his sons stopped by his house on either December 7, 2011, or December 8, 2011. Melvin testified that he picked up a bag inside his son's vehicle and noticed that the bag felt "a little bit weighty." Although Melvin did not know what the bag contained, he told his sons that the bag made him feel uncomfortable. After Melvin instructed his sons to take the bag and its contents away from his house, Collins and Joshia took the bag and left.

The jury heard additional testimony from Collins's brother, Joshia, who stated that both he and Collins had been friends with Jenkins. Joshia testified that he lived at an apartment complex located within walking distance of the place where the police found Jenkins's body. Joshia testified that his brother called him around 10:54 p.m. on December 7, 2011, from their sister's phone. Collins arrived at Joshia's apartment complex later that night. According to Joshia's testimony, Collins wore a gray hoodie when he arrived at the apartment complex and appeared to be out of breath.

9

Joshia testified that he and his brother stopped by their father's house the next day. Joshia confirmed that his father told him and his brother to get rid of the bag they had in their car. Joshia maintained during his trial testimony that he neither looked inside the bag nor saw his brother with a weapon at any point in time. According to the statement he gave to police officers, however, Joshia said that, upon feeling the bag, he could tell the bag contained a weapon. Joshia also told officers that, when he and Collins left their father's house, they drove along Highway 59, and Collins hid the bag in the woods.

The State called two detectives as witnesses, and both men testified that Joshia led them and another officer to the location where Collins hid the bag in the woods. The detectives further testified that the bag contained a gray hoodie wrapped around a gun. Although the gun's serial number was partially scratched off, a crime scene investigator examined the gun and determined it was the gun registered to Miles. After performing additional tests, a forensic scientist concluded that the gun fired the shell casing police officers found near Jenkins's body.

In addition to finding the shell casing at the crime scene, officers discovered Jenkins's cell phone and car keys on her body. Jenkins's phone records revealed that the last call she received came from a phone owned by Collins's father. Police learned that Collins's sister normally used the phone but that she allowed Collins to use the phone around the time of Jenkins's murder. When Detective Joey Scott interviewed Collins, Collins confirmed that he had possession of the phone around the time of Jenkins's murder.[]

Detective Scott testified that Collins initially told officers he did not know Jenkins very well and was working the night of December 7, 2011. Officers subpoenaed Collins's work schedule, however, which showed that Collins was not at work on December 7, 2011. After officers showed Collins some phone records for December 7, 2011, Collins admitted to having contact with Jenkins that night. Detective Scott testified that Collins then told officers that Jenkins called him and asked for a ride. However, as Detective Scott stated in his testimony, officers had already learned that Jenkins's car was working when she was killed, that her car was parked within walking distance of her location, and that she had her car keys in her pocket. After further questioning, Collins told officers that he arrived at Jenkins's location on December 7, 2011, to pick her up but could not find her.

Based on the phone records they obtained, officers determined that Collins and Jenkins exchanged several phone calls and text messages the night

10

of December 7, 2011.

*Collins*, 2014 WL 4977498, at **1-3. Detective Casey Sims testified in detail regarding the phone records, the authenticity of which was stipulated by Collins. Sims was first asked if he had received any "special" or "specific" training. Sims replied that "I have actually that was relevant to this case. I went to a 16-hour course on cellular technology used in law enforcement." He testified that the course "taught me how to deal with the phone companies, how to interpret phone records, and also how to take those records and, you know, it'll have tower information, GPS location, and how to put those on a mapping software basically to make a map to show, hey, this is where this call originated from and that type of thing." Detective Sims then testified about what the mapping software does:

> When you get some cell phone records, they'll have latitude and longitude. Now, sometimes you can get the actual GPS location of the phone. In other cases you get the GPS location or latitude and longitude of the cell phone tower, and it can also give you information that gives you the direction that the caller is in. Most cell phone towers have the three heads, so they'll go out in three different directions, and you can tell, hey, this person making this call is in, you know, this general direction – within a range. And then we can put that on a map and show you. Say when we look at someone's cell phone records, we can know, hey, they called from this general area.

Detective Sims went on to explain the phone records and the mapping he had done, and Collins objected to the fact that Detective Sims was not established as an expert witness. The trial court overruled the objection. Detective Sims first explained the phone records, indicating what each column in the records means. Then he began to explain mapping. He stated that

> A. . . . So what I was able to do, the mapping software that I got from my training, I was able to plug in this latitude and longitude and come up with

11

location of that cell site. Now, these first two interactions that the suspect and the victim had here, that's got cell site, but it does not have a direction. You see how it's a couple numbers shorter on these two column [sic]. It just doesn't have – it's hitting off that tower. As I explained earlier, there's three different heads on each tower, we don't know which head. We just know it was going to that tower. Now, after those first two, all the rest of these are on the same – hitting at that same tower, and the head has got it as 120 right there. And basically if that cell phone tower – if it was on a map and you said straight up and down is 0 or 360, and it goes around, you know, to the right 90 degrees all the way down to 180, 270, all the way back up to 360. It's a 360-degree radial around that cell phone tower. That number 120 means we're going to go over 120 degrees, and that's going to be the center of that head. Like I said, there's three heads to each cell phone tower, so that would be the center of the head, and you'd have basically a 33-degree angle going this way. The significance of these – this is, you know – this is right around the time that during our investigation we determined that the murder happened.

. . .

Q. Now, what is that document?

A. It's a [sic] basically a map[3] that I made using that software that I told you about. I got from my training. Plugging in the coordinates from those records, from those cell phone towers, plugging in those times into that mapping software basically to kind of tell a story or show a picture of where our suspect and victim were with their different cell phones at the time during the murder.

. . .

A. Okay. Basically what this is is [sic] the suspect and the victim during their whole communication the night of the murder, during that last hour or so, both their cell phones hit off these three towers the whole time. I'm sorry. Four towers. If you looked at the suspect's, remember he had – I actually did this off the SMS records – the text messaging records. This was the first tower. We couldn't get a loca – you know, a direction I told you about. How it had a number short. All we know is that the suspect's cell phone hit off this tower

---

[3]The map points to cell phone towers that Collins's and Jenkins's phones hit off of and has drawn on it a pie-piece-shaped highlighted area emanating from three of the four cell phone towers labeled on the map. The highlighted area purports to demonstrate the area in which the cell-phone user was located, corresponding to the direction from which the cell phone hit the tower.

right here. This is a map of Hattiesburg. . . . We located the victim's car . . . . Right in this area, but we have a visual representation of that with a little car here. The victim's body was actually found right here. The – plugging in those text message records, the first one – the first text message from the suspect was at this tower. After that, every single text message the suspect sent was sent from him in this area right here, so he was at this tower. He traveled to where he was going, and he stayed here the rest of the time. Didn't move. Okay. So every communication he had between the victim from his first initial contact with her was him lying in wait over here. The sus – the victim – I'm sorry. She ranged throughout here. I think through the investigation I was able to determine she had gone to the mall that night or something, so I think that explains why she was out west. She had been talking to one of her friends and gone to the mall. She was moving at different times. Here is at 22:24 hours, which that's military time. . . . At 21: 58, which would be 9:58, the suspect was hitting off this cell phone tower. And again, I told you that some of the records had information – there's basically three heads on each tower, so it could have been – she could have been out in this area. Draw an imaginary line right here. She could be in this area or this area. Well, she hit off this edge of the tower, which probably she was driving down 4th Street right here headed to the mall. Okay. That was the first contact they had between each other. Then she hit off of this tower somewhere in this direction just driving around, and she continued to get messages back and forth between her and the suspect. The last few messages are between her and the suspect are in the same location. Okay. See this tower has a lot of – it's got the victim's body. It was found right here within this confines of that direction from the tower. Okay. So basically she's talking back and forth with the suspect, and they keep getting closer and closer. She goes all the way from out here back to this tower again, and then the last few communications, they were both in this area where her body is found. So basically the suspect – he has one text message at the very beginning over here. Here's here, and the victim is somewhere in here driving to the mall. Okay. The victim goes out here. His next text message, he's in here. The victim – her next text message is here, and then she continues to have more text messages as she's going back toward this area until the last couple of times where they meet up – obviously is in the area where her body is located.

¶5. Detective Sims then testified about a second map he had created. This map plots the exact path Detective Sims speculates that Jenkins traveled, and also states in type on the map that "Ebony is traveling west on 4th Street." He testified:

13

A. Okay. Again it's the exact – pretty much the same thing as that other map. It just has voice calls added into it here. See Jairus was using this tower right here for all these. . . . The – again, it's basically just using these – those three main towers where the suspect's is all right here. Her's travels throughout and back and, you know, culminates with both of them having a voice call at 11 p.m. – a very short thirty second voice call. Like, hey, okay, I see you. Hang up and then meeting up. Pretty much. . . .

Q. Am I understanding this correctly that these text messages and voice call at eleven – they were both pinging off the same tower?

A. That is correct and that same head. Basically, you know, I said there's three heads on the tower, so they're both – which means they're in a close geographic location. . . .

Thus, as the Court of Appeals noted, Detective Sims "testified that, at the time of the last few communications, Collins and Jenkins were both in the area where officers later found Jenkins's body." **Collins**, 2014 WL 4977498, at *3.

¶6.    The jury found Collins guilty of murdering Jenkins. The trial court sentenced Collins as a habitual offender, sentencing him to life in prison without the possibility of parole or early release. Collins filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The trial judge denied this motion, and Collins appealed. In the Court of Appeals, Collins argued that 1) his statement to police should have been suppressed due to his invocation of his right to counsel; 2) without his statement, insufficient evidence supports his conviction, and therefore, double jeopardy prohibits his retrial; 3) that the trial court impermissibly restricted defense counsel from commenting on the involuntary nature of his statement to police; 4) that Detective Sims's testimony regarding Collins's and Jenkins's locations, based on cell phone records, was impermissible as lay testimony, and the State was required to qualify Sims as an expert; 5) that his habitual offender sentence was unconstitutional; and 6) that his conviction was against the overwhelming weight of the

14

evidence. The Court of Appeals affirmed his conviction. After Collins's motion for rehearing was denied, he filed a petition for writ of certiorari with this Court, arguing that the Court of Appeals erred on all six issues he raised in his direct appeal. This Court granted certiorari. On review, we limit the issues, addressing two of the six issues presented. *See Guice v. State*, 952 So. 2d 129, 133 (Miss. 2007). We address whether Collins's statement to police should have been suppressed, and we address the issue of whether witnesses giving certain testimony based on cell phone records must first be qualified as an expert.

**ANALYSIS**

*1. Suppression of Statement*

¶7.     "Whether a confession is admissible is a fact-finding function for the trial court, and its decision will not be overturned unless the trial court applied an incorrect legal standard, committed manifest error, or made a decision against the overwhelming weight of the evidence." *Haynes v. State*, 934 So. 2d 983, 988 (Miss. 2006).

¶8.     The Fifth Amendment to the United States Constitution provides that, in a criminal case, no person shall be compelled to be a witness against himself. U.S. Const. amend. V.[4] In *Miranda*, the United States Supreme Court created procedural safeguards to protect the Fifth Amendment right to silence, including that a defendant has the right to have an attorney present during an interrogation, as an attorney can safeguard a defendant's Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "[I]f the individual [in custody] states that he wants an attorney, the interrogation must cease until an

---

[4]The Mississippi Constitution similarly provides that, in a criminal prosecution, no person shall be compelled to give evidence against himself. Miss. Const. art. 3, § 26.

attorney is present." *Id.* at 474. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475. Accordingly, the prosecution bears the burden of proving beyond a reasonable doubt that a statement was given after a valid waiver. *Jordan v. State*, 995 So. 2d 94, 106 (Miss. 2008). The determination of whether a defendant's rights were waived voluntarily, knowingly, and intelligently is a mixed issue of law and fact. *Id.*

¶9. "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Thus, once the right to counsel is invoked, the police may not subject the accused to further interrogation until counsel is made available, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. The Court in *Edwards* did note that, had the accused initiated the meeting with police, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from *merely listening* to his voluntary, volunteered statements and using them against him at the trial." *Id.* at 485 (emphasis added). Absent an "interrogation," "there would have been no infringement on the right that [the accused] invoked and there would be no occasion to determine there had been a valid waiver." *Id.* at 485-86. However,

16

[i]f, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Id.* at 486 n.9. The Supreme Court later clarified that, in order to admit an accused's statement into evidence after an invocation of the right to counsel, the accused must initiate the conversation, and then, "where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-45, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983). "The inquiries are separate," thus, it must first be determined whether the accused initiated the conversation, and then, if he did, it must be determined whether he knowingly and intelligently waived the rights he previously invoked. *Id.* at 1045; *Haynes v. State*, 934 So. 2d 983, 988 (Miss. 2006).

¶10. In determining whether the accused "initiated" conversation after an invocation of rights, the Court noted that inquiries "relating to routine incidents of the custodial relationship[] will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045. For example, "some inquiries, such as a request for a drink of water or a request to use a telephone . . . are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* Thus, "the Supreme Court's use of the term 'initiate' involves more than the inquiry of simply 'who talks first.'"

17

*Haynes*, 934 So. 2d at 988. The trial court did not acknowledge this standard, but appeared to examine only who spoke first, finding "The officer left the room, and then the defendant initiated contact with the officer."

¶11. Clearly, Collins "talked first." But the inquiry of whether he "initiated" conversation does not end there. In its brief for the Court of Appeals, the State completely misrepresented Collins's statement in order to make the argument that Collins's contact with police was "initiation" for purposes of *Edwards*. In its brief, the State represented that Collins's first contact with police was "I going to tell ya'll everything . . . I don't need a lawyer, don't need a lawyer." In actuality, he *reiterated* his invocation of his right to counsel in his initial contact with police, stating "hey (inaudible) everything (inaudible) but, I can just call and get my lawyer, he can be present, I going to tell ya'll everything, . . . I don't need a lawyer, don't need a lawyer . . . ." Furthermore, this Court has reviewed the video, and the ellipses in the transcript are actually inaudible statements by Collins, thus the transcript should read: "hey (inaudible) everything (inaudible) but, I can just call and get my lawyer, he can be present, I going to tell ya'll everything, (inaudible) I don't need a lawyer, don't need a lawyer (inaudible)." The State has shown no context for the "I don't need a lawyer statement," which seems of import given that, practically in the same breath, Collins reiterated that he wanted his lawyer present for any interrogation by police. After this statement, Collins began asking how long things would take, indicating that he needed to call his employer, and indicating his concern about his job. Not only does the transcript reflect this, but Detective Scott also specifically testified that Collins's initial contact with police after his invocation

18

of his right to counsel was to inquire as to how long things would take.

¶12.    In *Haynes*, the accused initiated contact with police, and "did not say he wanted to talk about his case, but instead asked . . . several questions about his bond, scheduling, and a preliminary hearing." *Haynes*, 934 So. 2d at 987.  The Court found these to be "procedural matters" and deemed them as matters relating to routine incidents of the custodial relationship.  *Id.* at 989.  Thus, the Court found that such questions "did not 'initiate' a conversation as the word was used in *Edwards*."  *Id.*  Asking how long things would take because he needed to call his employer if he would miss work is also a matter relating to routine incidents of the custodial relationship.  As admitted in Detective Scott's testimony, Collins simply wanted to know the length of time he was to be held so he could make arrangements with his employer.  He did not evince a "willingness and a desire for a generalized discussion about the investigation." *Id.* (quoting *Bradshaw*, 462 U.S. at 1046).  Such questions do not constitute "initiation" of conversation as is contemplated in *Edwards*.  Moreover, given the State's heavy burden of proof, and the fact that it has not even proven what Collins's first words to Detective Scott actually were (due to the fact that much of the statement was inaudible), the State has failed to adequately prove that Collins initiated conversation with police.  The trial court applied the incorrect legal standard on this issue, and consequently abused its discretion, and Collins's conviction must be reversed.  For the sake of thoroughness, we will address the second step of the analysis, although the finding in the first step alone requires reversal.

¶13.    Even if Collins did "initiate" the conversation, the State bears the burden of proving

19

beyond a reasonable doubt that his subsequent statement was given knowingly and intelligently under the totality of the circumstances, because Detective Scott actively interrogated Collins, rather than merely listening to him. *Bradshaw*, 462 U.S. at 1044-46; *Edwards*, 451 U.S. at 486 n.9. For a statement to be admissible, it must not have been given "because of promises, threats or inducements." *Moore v. State*, 933 So. 2d 910, 919 (Miss. 2006) (quoting *Dancer v. State*, 721 So. 2d 583, 587 (Miss. 1998)). With Collins obviously being concerned about his job, Detective Scott began to reiterate that the police could not do anything to help Collins "because you said you wanted your lawyer." Clearly, Detective Scott could have informed Collins of an approximate time or allowed him a phone call to contact his employer, yet he instead represented to Collins that nothing could be done for him *because* he asked for a lawyer, appearing to use Collins's invocation of his right to counsel against him, to pressure him into a statement. *See Downey v. State*, 144 So. 3d 146, 152 (Miss. 2014) (regarding clarifying an ambiguous request to counsel, the Court held that the "officer in this case overstepped the limits of proper clarification by emphasizing the amount of time and difficulty that would be involved in obtaining counsel" and that "[i]t was only after the officer told Downey that her attorney could not get there 'right this minute' that she acquiesced in talking with the officer"). Moreover, Detective Scott used promises and inducements to convince Collins to give a statement. He asked whether Collins would talk to him if Detective Scott refrained from asking him about guns; then, in short order, he asked Collins if Collins owned a gun. Detective Scott also made several statements that he would simply listen to whatever Collins chose to tell him, in response to Collins expressing

20

displeasure regarding Detective Scott's questions. He also affirmatively stated that he needed Collins to sign another *Miranda* waiver in order for them to talk; yet, Detective Scott never had him sign a second *Miranda* waiver, something that was likely confusing to Collins. He further promised Collins that Collins could trust the police. The trial court made no findings regarding these promises and inducements, but merely found that Collins's statement was voluntary because he had recently been given a *Miranda* warning and was thus aware of his rights. Given the pressure exerted on Collins to give a statement after he had exercised his right to counsel, the (broken) promises and inducements (primarily regarding Detective Sims's representations to Collins that he would merely listen to whatever Collins chose to tell him rather than reinterrogate him), the fact that Collins was not administered a second *Miranda* warning despite specific representations by Detective Sims to Collins that he could not validly speak with him without doing so, even if he did initiate contact with police, the State failed to prove beyond a reasonable doubt that Collins's statement was knowing and intelligent. Thus, the trial court manifestly erred in denying Collins's motion to suppress, as finding the statement admissible was contrary to the overwhelming weight of the evidence.

### 2. Testimony on Cell Phone Records

¶14. "The standard of review regarding the admission or exclusion of evidence is abuse of discretion." *Palmer v. State*, 939 So. 2d 792 (Miss. 2006). Whether the type of testimony at issue regarding cell phone location technology is expert or lay testimony under Mississippi law is an issue of first impression in this Court.

21

¶15. Mississippi Rule of Evidence 701 provides that lay witnesses may give opinion testimony so long as that testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." M.R.E. 701. Rather, any opinion testimony by a lay witness must be "rationally based on the perception of the witness." *Id.* Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. . . ." M.R.E. 702. If expert testimony is to be offered, special discovery rules apply, which allow the opposing party to learn of the basics of the expert's opinion and hire his own expert, if necessary. *See, e.g.*, M.R.C.P. 26(b)(4).

¶16. This Court has held that "where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a M.R.E. 702 opinion and not a 701 opinion." *Langston v. Kidder*, 670 So. 2d 1, 3-4 (Miss. 1995). The distinction is important because "[l]ay and expert witnesses are treated differently in discovery" and the opposite party is entitled to "notice and opportunity to prepare rebuttal" regarding expert testimony. *Id.* "A lay witness's unique qualifications have no bearing on the witness's ability give [sic] a lay opinion." *Heflin v. Merrill*, 154 So. 3d 857, 863 (Miss. 2014). In *Heflin*, the plaintiff's husband, an insurance agent, attempted to testify as to the exact speed at which the car that hit their car was traveling. *Id.* The plaintiff attempted to bolster his qualification to give a lay opinion about speed by citing his experience as an insurance agent. *Id.* The Court found that Rule 701 "prohibits lay opinions

22

that are based on special training and knowledge." *Id.* Furthermore, this Court has held that because "the public hold police officers in great trust, the potential harm to the objecting party requires reversal where a police officer gives expert testimony without first being qualified as such." *Kirk v. State*, 160 So. 3d 685, 693 (Miss. 2015). In *Kirk*, a police officer testified that marks on a victim's neck were from strangulation. *Id.* While the Court ultimately held that the defendant waived the issue by failing to object in the trial court, it determined that "[w]hile [the police officer] may have been able to testify regarding his observations, e.g., that [the victim's] neck had red marks on it, his testimony that it appeared [the victim] had been strangled constituted the sort of testimony properly reserved to an expert." *Id.*

¶17. The courts that have addressed whether testimony which purports to locate people based on cellular data is lay or expert testimony are divided. *See* Alexandra Wells, Comment, *Ping! The Admissibility of Cellular Records to Track Criminal Defendants*, 33 St. Louis U. Pub. L. Rev. 487 (2014); James Beck, Christopher Magana & Edward J. Imwinkelried, *The Use of Global Positioning (GPS) and Cell Tower Evidence to Establish a Person's Location – Part II*, 49 No. 3 Crim. Law Bulletin ART 8 (Summer 2013); Aaron Blank, Article, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 Rich. J.L. & Tech. 3 (Fall 2011).

¶18. Detective Sims testified regarding the cell phone towers that Collins's and Jenkins's cell phones used to make and receive phone calls and to send and receive text messages around the time of Jenkins's death. He also produced and explained a map that depicted the

areas in which he opined Jenkins and Collins must have been at certain times, with highlighting of those areas. This information was based on which cell tower and at which angle their cell phone signals hit. Yet, highly problematically, Detective Sims never testified as to the coverage area of each cell tower or antenna; he merely testified that the yellow highlighted area was "roughly" the circumference of the area served by the tower to which it corresponded. He never testified regarding how he determined the service area of each antenna or that it was the actual service area. Detective Sims also testified that Collins and Jenkins were "in a close geographic location. They're hitting off the same tower in the same direction from the tower." This testimony is also problematic. A discussion on the technology of cell site location is helpful to illustrate why this is so problematic.

¶19. "A cellular phone operates as a two-way radio that transmits and receives signals through a cellular network." Blank, *supra*, at *5. "Cell towers are typically arranged in order to cover an area the shape of a hexagon, forming a structure that looks much like a honeycomb with the cell tower in the middle of three different hexagonal areas." Wells, *supra*, at 491. In other words, the location where three hexagonal cells meet is called the cell site, or cell tower. Blank, *supra*, at *5. This shape is preferable to a circle, as it allows more coverage, leaving no area lacking in service. Wells, *supra*, at 491. Most towers have three directional antennas, and each antenna ordinarily covers 120 degrees of one of the three separate cells that meet at the cell cite. Beck, *supra*, at WestlawNext p. 3. When a cell phone user makes a phone call, "a mobile switch within the phone selects the cell site with which it has the strongest connection to establish a registration." *Id.* at 4. However, the tower

24

to which the cell phone connects, the one with the strongest signal, is not necessarily the closest tower to the cell phone. *Id.* Additionally, "[a]djoining cells provide some overlap in coverage to avoid disconnection from the network when the signal strength of the site servicing the call drops by transferring the call to the next cell with the strongest signal." Blank, *supra*, at *6.

¶20.    Several methods of locating a cell phone's location based upon network data exist. Beck, *supra*, at 4.  Cell Identification is the method that was apparently used by Detective Sims, as this is the method that uses the cell phone records to establish a user's location. *See id.* "Call Detail Records identify the tower used to process the call, and will often indicate which antenna on the tower serviced the call.  Knowing the coverage area of the tower or, better still, the smaller coverage area of the antenna, an expert can infer that the user was within that geographical coverage area at the time the call was placed." *Id.* at 5.  The coverage areas can be quite large, ranging from a few hundred feet, to approximately 2,700 square miles. *Id.*; Blank, *supra*, at *5.  "At most, a proponent of the evidence could argue that the evidence shows that the user was *somewhere* within this zone.  That is the *only* necessary inference from the cell identification technique."  Beck, *supra*, at 5 (second emphasis added).  Even when the specific antenna is pinpointed, and the coverage zone is reduced from 360 degrees to 120 degrees, the coverage area is usually large. *Id.*

¶21.    "While the large geographical area that a single cell can cover diminishes the probative value of the cell identification technique, perhaps the biggest drawback of the technique is that cell phones can be associated with cell sites that are not even in close

25

physical proximity." *Id.* This is because cell phones connect to the cell site with the strongest signal, rather than simply connecting to the closest cell cite. *Id.*

> Among the factors affecting which cell site a phone connects with are: (1) the number of available cell sites; (2) whether maintenance or repairs are being performed on a given cell site; (3) the height of the cell tower; (4) the height and angle of the antennas on a cell tower; (5) the range of coverage; (6) the wattage output; (7) the call volume at any given time and the call capacity of a cell cite [sic]; and (8) environmental and geographical factors such as weather, topography, and the density of physical structures in the area.

*Id.*; *see also* Blank, *supra*, at *7. Additionally, characteristics of the phone, such as wattage output and broadband capability, as well as whether the phone is used indoors or outdoors, may affect signal strength. Blank, *supra*, at *7. "Due to the limitations of cell identification technique, a better technique for locating an individual's precise location involves using angulation or a form of lateration. . . ."[5] Beck, *supra*, at 5.

¶22. Thus, while the technology underlying cell identification is not extremely difficult to understand, utilizing cell identification to locate a person does require specialized knowledge regarding such technology – namely, knowledge regarding the various antennas on cell sites and the cell site coverage range and how those interact to determine the entire area in which a cell phone user might have been located while making a cell phone call. Illustrating that cell identification requires specialized knowledge are the facts that Detective Sims had to take a sixteen-hour course on how to use cellular technology in law enforcement and that he used specialized software acquired at this course to determine the locations of Collins and Jenkins on the night of Jenkins's murder.

---

[5]It does not appear that Detective Sims used angulation or lateration.

26

¶23.    The Maryland Court of Special Appeals addressed a similar issue, in which a detective "testified at length about mapping [the defendant's] whereabouts around the time of the [crime] by the use of cell phone tracking and GPS technology." ***Wilder v. State***, 991 A.2d 172, 180 (Md. Ct. Spec. App. 2010).  The testimony included testimony regarding "using software to produce a map that depicted locations of cell phone calls." ***Id.*** at 191, 193.  The court noted that Maryland's Rule of Evidence regarding lay testimony followed the approach of Federal Rule of Evidence 701, which "[b]y channeling testimony that is actually expert testimony to Rule 702, the [2000] amendment [to Federal Rule 701] also ensures that a party will not evade the expert witness disclosure requirements. . . simply by calling an expert witness in the guise of a layperson." ***Id.*** at 196-97 (quoting Federal Judicial Conference, Committee on Rules of Practice and Procedure, *Report of the Advisory Committee on Evidence Rules (Committee Note to Rule 701)* at 26-27 (1999), *reprinted in* Court Rules: Amendments to Federal Rules of Evidence (Committee Note to Rule 701), 192 F.R.D. 340, 416-17 (2000)).

¶24.    The Maryland court recognized that "cellular telephone technology has become generally understood."  ***Wilder***, 991 A.2d at 199.  It also acknowledged that certain information regarding cell phone bills may be readily discerned by a juror familiar with his own cell phone bill. ***Id.***  However, it noted that the detective's testimony "implicated much more than mere telephone bills." ***Id.***  He had "elaborated on the information provided by the cell phone records – the bills and records of calls – by his use of a Microsoft software program to plot location data on a map and to convert information from the cellular phone

27

records in order to plot the locations from which [the defendant] used his cell phone[,]" which the court found required some specialized knowledge or skill not in the possession of the jurors." *Id.* at 199-200. The court ultimately held that "the better approach is to require the prosecution to offer expert testimony to explain the functions of cell phone towers, derivative tracking, and the techniques of locating and/or plotting the origins of cell phone calls using cell phone records." *Wilder*, 991 A.2d at 198. This is because the detective's "description of the procedures he employed to plot the map of [the defendant's] cell phone hits was not commonplace. Because his explanation of the method he employed to translate the cell phone records into locations is demonstrably based on his training and experience[;]" thus, the court concluded that the detective should have been qualified as an expert and the State should have been obliged to fulfill the discovery obligations attendant with calling an expert witness. *Id.* at 200.

¶25. In another similar case, the Missouri Court of Appeals held that similar testimony "amounts to opinion testimony that is properly the province of an expert." *State v. Patton*, 419 S.W.3d 125, 132 (Mo. Ct. App. 2013), *application for transfer to Missouri Supreme Court denied* (Feb. 25, 2014). The court acknowledged that "cellular phones are a subject of everyday experience, and that little technical knowledge is required to understand that a phone will connect to the cell site with the strongest signal." *Id.* at 131. However, the court noted that

> it is impossible to determine from historical cell site data alone that a phone was closest to the cell site processing the call, and at best these records only indicate that a phone was located somewhere within a cell site's geographical coverage area. A cell phone may be in range of several sites simultaneously,

and a multitude of factors influence which site among them will have the strongest signal. The technical features of the cell site, geography, and the workings of the cell phone itself may result in connections from as far away as thirty miles or as close as thirty feet. Thus, knowing the location of the cell site to which a phone connects permits an expansive range of inferences as to where the phone actually is. We think that drawing such an inference without the aid of specialized experience or knowledge in the field of cellular communications comes too close to mere speculation.

*Id.* at 131-32 (internal citations omitted). The court concluded that

[t]o narrow down the area in which [the defendant's] phone must have been to have connected to a particular cell site – i.e., to proffer testimony actually probative of whether [the defendant] was in one area rather than the other – required analysis of the many variables that influence cell site signal strength. Such analysis amounts to opinion testimony that is properly the province of an expert.

*Id.* at 132.

¶26. In a federal district court case, the court determined that an FBI agent could provide lay opinion testimony regarding the call data records obtained for the cell phone at issue and the location of cell towers used by the cell phone. *United States v. Evans*, 892 F. Supp. 2d 949, 954 (N.D. Ill. 2012). However, it determined that the agent must qualify as an expert to testify regarding "(1) how cellular networks operate, *i.e.*, the process by which a cell phone connects to a given tower or (2) granulization theory[.]" *Id.* Granulization theory is similar to how Detective Sims created his maps.

To determine the location of a cell phone using the theory of granulization, Special Agent Raschke first identifies (1) the physical location of the cell sites used by the phone during the relevant time period; (2) the specific antenna used at each cell site; and (3) the direction of the antenna's coverage. He then estimates the range of each antenna's coverage based on the proximity of the tower to other towers in the area. This is the area in which the cell phone could connect with the tower given the angle of the antenna and the strength of its signal. Finally, using his training and experience, Special Agent Raschke

29

predicts where the coverage area of one tower will overlap with the coverage area of another.

*Id.* at 952. The court found that understanding how various factors affect a cell phone's ability to connect to a certain tower "cannot be said to be within the perception of the untrained layman[,]" but rather requires scientific, technical, or other specialized knowledge of cellular networks. *Id.* at 954.

¶27. We recognize that other courts have determined that similar testimony may be offered as lay testimony. *See, e.g.*, *State v. Fleming*, 286 P.3d 239 (Table) (Kan. Ct. App. 2012) (unpublished opinion); *Perez v. State*, 980 So. 2d 1126 (Fla. Dist. Ct. App. 2008). In a case with different facts, the Court of Appeals held that lay testimony regarding certain cellular data was acceptable. *Malone v. State*, 73 So. 3d 1197, 1201 (Miss. Ct. App. 2011). In *Malone*, one cellular company employee testified regarding the information found in the cell phone records. *Id.* Additionally, the State submitted a map from the cell phone company that contained cell-tower locations and coverage areas. *Id.* A second cell phone company employee explained where the cell-tower locations and coverage areas were located on the map. *Id.* The court found that this was appropriate lay testimony, as the custodians of business records were merely explaining those records. *Id.* *Malone* can be largely distinguished from the case at hand, and to the extent it cannot be distinguished, we overrule it. Based on our precedent on lay testimony, we agree with the Maryland Court of Appeals that the better approach is to require "expert testimony to explain the functions of cell phone towers, derivative tracking, and the techniques of locating and/or plotting the origins of cell phone calls using cell phone records." *Wilder*, 991 A.2d at 198.

30

¶28. We find that testimony that simply describes the information in a cell phone record is properly lay testimony. Likewise, testimony that merely informs the jury as to the location of cell phone towers may properly be lay testimony when it is based upon the personal observations of the witness.[6] But testimony that goes beyond the simple descriptions of cell phone basics, specifically testimony that purports to pinpoint the general area in which the cell phone user was located based on historical cellular data, requires scientific, technical, or other specialized knowledge that requires expert testimony.[7] Indeed, Detective Sims testified himself that he had specialized training in order to be able to use cellular technology to locate defendants – he had to take a course on cellular technology use in law enforcement, testimony which the State used to bolster Detective Sims's credibility on this issue.[8] Yet, "[a] lay witness's unique qualifications have no bearing on the witness's ability to give a lay opinion." *Heflin*, 154 So. 3d at 863.

¶29. We do recognize that cellular technology is relatively simple and that the expertise necessary to be qualified as an expert would not be so great as that required of, for example, a medical doctor. We do not mean to imply that the hurdles to qualifying as an expert in this field are unduly burdensome. *See, e.g.*, **People v. Roby**, 2011 WL 5067252 (Mich. Ct. App.

---

[6]This was the type of testimony that the Court of Appeals apparently addressed in *Malone*, thus it properly held that such testimony was lay testimony.

[7]To the extent that *Malone* addressed this type of testimony and determined it was lay testimony, it is overruled.

[8]Notably, Detective Sims did not testify as to *any* other specialized training he had in his more than ten years in law enforcement, he only mentioned the cellular technology training.

Oct. 25, 2011) (detective who had two-day course in forensic analysis of cellular data and had applied the training in numerous cases, and who explained his methodology, was qualified as an expert). However, some specialized knowledge beyond that of the average, randomly selected adult is required to analyze cellular phone records and other data to determine the location, general or specific, of a certain cell phone. Not only did Detective Sims testify regarding the general locations of Collins's and Jenkins's cell phones, he went even further in Exhibit 46 and opined as to Jenkins's *exact* location based on the cell phone records, stating on the map that "Ebony is traveling west on 4th Street." This testimony was clearly not based upon Detective Sims's own perceptions. To utilize such testimony, the State was required to qualify Detective Sims as an expert, and consequently, Collins was entitled to pretrial disclosures regarding expert witnesses. Additionally, Detective Sims, as a police officer, held the public trust, and his giving expert testimony without being qualified as such was particularly harmful to Collins. *See **Kirk***, 160 So. 3d at 693. In that vein, allowing this testimony was obviously not harmless error. Detective Sims's testimony placed both Collins and Jenkins in the same geographic area at the time of the murder, and it was the only evidence at trial to do so. Thus, the trial court erred in allowing Detective Sims to testify as a lay witness regarding the location of Collins's and Jenkins's cell phones.

## CONCLUSION

¶30. The trial court erred by failing to suppress Collins's statement to police after he invoked his right to counsel. It further erred by allowing Detective Sims to testify as a lay witness regarding cell phone location technology when such opinion testimony requires the

32

witness be qualified as an expert. Accordingly, we reverse the judgments of the Court of Appeals and the Forrest County Circuit Court and remand the case for further proceedings consistent with this opinion.

¶31.   **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., CONCURS WITH PART II AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. LAMAR, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.**