CARLTON, J.,
DISSENTING:
¶ 52. Because I would affirm. White’s convictions and sentences, I respectfully dissent from the majority’s opinion,.
¶ 53. Pursuant to a nine-count ■ indictment, a Hinds County grand jury indicted White for four counts of armed robbery, four counts of armed carjacking, and one count of possession of stolen property. See Miss. Code Ann. § 97-3-79' (Rev. 2006); Miss. Code Ann. § 97-3-117 (Rev. 2006); Miss. Code Ann. § 97-17-70 (Supp. 2012). A jury subsequently found White guilty of two counts of armed robbery, two counts of armed carjacking, and one count of possession of stolen property. On appeal from his convictions, White raises the following issues: (1) whether the circuit court erred by refusing his request for á continuance on the first day of trial; (2) whether the circuit court erred by admitting .lay-witness testimony about the alleged location of a victim’s cell phone; (3) whether the circuit court erred by admitting testimony that violated his right to confrontation; (4) whether the circuit court erred by failing to sua sponte sever the counts against him; (5) whether the circuit court erred by denying his motion to admit evidence of an audio-taped conversation; (6) whether the circuit court illegally sentenced him to serve ten years for possession of stolen property; (7) whether his statutory right to a speedy trial was violated; and (8) whether insufficient evidence existed to support the verdicts for Counts I, II, V, and VI, or alternatively, whether the ver- *874 diets for Counts I, II, V, and VI were against the overwhelming weight of the evidence.
FACTS
¶ 54. On August 21, 2013, the grand jury returned a nine-count indictment against White. Counts I and II charged White with the armed robbery and armed carjacking of Penman on April 7, 2013. Counts III and IV charged White with the armed robbery and armed carjacking of Davis on April 22, 2013. Counts V and VI charged White with the armed robbery and armed carjacking of Thomas on April 22, 2013. Counts VII and VIII charged White with the armed robbery and armed carjacking of Taylor on April 23, 2013. Count IX charged White with the possession of Bailey’s stolen vehicle on April 24, 2013.
a. White’s Motions to Dismiss for Lack of a Speedy Trial
¶ 55. Pursuant to Mississippi Code Annotated section 99-17-1 (Rev. 2015), White filed a pretrial motion on October 22, 2014, seeking to dismiss the charges against him for failure to provide a trial within 270 days of his arraignment. After a hearing on the matter, the circuit court entered a November 14, 2014 order denying White’s motion.
¶ 56. At the final pretrial-motions hearing, White’s attorney renewed the motion to dismiss for lack of a speedy trial.-As during the first hearing on the issue, both parties agreed that more than 270 days had passed since White’s arraignment. However, the State asserted the delay was due in no part to the State’s actions but simply due to an overcrowded case docket. After considering the parties’ arguments, the circuit court once more denied White’s motion to dismiss.
b. Penman’s Armed Robbery and Armed Carjacking
¶57. At White’s trial, the jury first heard testimony about the armed robbery and armed carjacking involving Penman. On April 7, 2013, Officer Anthony Johnson responded to a call about the armed robbery and armed carjacking. Officer Johnson arrived at the crime scene, where he met with and interviewed Penman. Penman told Officer Johnson that around 8 p.m. that evening an African American man wearing a white t-shirt and a blue ball cap had stolen his wallet, phone, and 2007 Toyota Corolla at gunpoint.
¶ 58. At White’s trial, Penman testified that he had just returned to his house in Jackson, Mississippi, after visiting his parents. Penman stated that he drove by a man walking down the street but did not think much of it. After pulling into his driveway, Penman turned his car off and began to send a text message to his girlfriend. As he was typing on his phone, Penman noticed some movement out of the corner of his eye. Glancing up at his rear-view mirror, Penman saw a man approaching his driver’s side door. Penman stated that the man opened the car door and held a silver gun to his side. Penman testified that it was not yet too dark outside and that he got a clear look at the man’s face. The man demanded Penman’s phone, wallet, and car keys. The man forced Penman to exit the vehicle, and then the assailant drove away in Penman’s car. After the man drove away, Penman phoned the police from a neighbor’s house.
¶ 59. Detective Kenneth West testified that White’s name surfaced as a possible suspect during the initial investigation of the crime. When police showed Penman a photo lineup of six possible suspects the day after the crime, Penman positively identified White as the man who robbed and carjacked him at gunpoint. Penman *875 also testified at trial that he downloaded an application (app) after the crime to notify him of his stolen phone’s location. Penman stated that he received an email the day after the crime that notified him the app had located his missing phone. The app gave Penman coordinates for his phone’s location. Penman testified that he used Google maps to look up the coordinates. He further testified that the online search indicated his phone was around 932 or 933 Carnation Street.[12] Penman immediately forwarded the information to Detective West.
c. Davis’s Armed Robbery and Armed Carjacking[13]
¶ 60. Detective West testified that, around 10:30 p.m. on April 22, 2013, police received another report about an armed robbery and armed carjacking. The victim, Davis, told police that she had just returned to her apartment complex after finishing work. As she pulled into her parking spot, Davis noticed an African American man walking in her direction. Davis parked her car, a white 2005 Jeep Cherokee, and began to walk to her apartment. Davis testified that someone snatched her car keys from her hand. When she turned around, she saw the same man she had observed earlier. Davis testified that the man pointed a gun in her face, stole her purse, which contained her phone, and then drove away in her vehicle. Davis stated that she ran inside her apartment and called the police.
¶ 61. Officer Willie Myers testified that he was on patrol around midnight on April 22, 2013, when he and another officer, Jeremy Nelson, spotted a vehicle matching the description of Davis’s stolen Jeep Cherokee. Officer Myers testified that the vehicle was parked in an apartment complex and that an African American man was standing by the open driver’s side door speaking to a woman. As the officers approached, the unknown male fled on foot. While Officer Nelson unsuccessfully pursued the male suspect, Officer Myers detained the female suspect, Yasekia Pruitt, for questioning.
¶ 62. Upon checking the vehicle’s license-plate number, the officers confirmed that it was the same Jeep Cherokee that Davis had reported stolen less than two hours earlier. Officer Myers testified that Pruitt claimed she did not know the male suspect’s identity but did know that he used the nickname “Star.” Pruitt described the male suspect to Officer Myers as an African American man around 140 pounds and 5’6” in height.
¶ 63. Davis testified at trial that the man who robbed her was in close proximity to her during the crime and that she got a good look at his face. Detective West stated that Davis described her assailant to police as an African American man wearing a gray hoodie and dark jeans. Detective West further stated that Davis described the gun the assailant used as a black semiautomatic handgun. On May 6, 2013, police showed Davis a photo lineup of six possible suspects. From the lineup, Davis positively identified White as the man who robbed and carjacked her at gunpoint.
d. Thomas’s Armed Robbery and Armed Carjacking
¶ 64. On the same night that Davis was robbed and carjacked at gunpoint, police *876 received another call around 11:10 p.m. about a second robbery and carjacking. The' latest victim, Thomas, reported that she returned to her apartment complex a little after 11 p.m. and parked her 2013 Honda Civic on-the street. As she exited her car, Thomas noticed a man approaching her with a gun already drawn. Thomas testified that she began to scream until the man told her to shut up. The man then took Thomas’s car keys and ordered her to throw her purse and another bag back into the car. Although the man told Thomas to lie on the ground, Thomas said that she ran toward the apartment complex and hid. The man drove off in Thomas’s car, and she used her phone, which was still in her possession, to call 911.
¶ 65. Corporal Nathan James responded to the report of the armed' robbery and armed carjacking involving Davis. Corporal James testified that Davis described her assailant as an approximately six-foot, 150-pound African American man wearing a white t-shirt and dark pants and holding a black handgun. At trial, Thomas testified that she clearly saw the man’s face. Thomas stated that the area was lit by a street light located just across the street from where she parked her car 'the night of the crime. In addition, Thomas testified that the assailant carne within an arm’s reach of her when he snatched her purse. On April 25, 2013, a few days after the robbery and carjacking, Thomas identified White from a photo lineup as her assailant.
e. Taylor’s Armed Robbery and Armed Carjacking[14]
¶ 66. The jury also heard from Taylor, who testified that she was robbed and carjacked at gunpoint around 9 p.m. to 10 'p.m. on April 23, 2013. Taylor stated that she drove to the house of her friend, Miller, after she finished work. Taylor testified that she and Miller were talking in her car in Miller’s driveway when a man with a gun knocked on her- driver’s side window. As the gunman instructed, Taylor opened her door and got out of the car. She testified that the man then walked around to the passenger’s side door, exchanged a few words with Miller, and had Miller exit the car as well. The assailant'then walked back to the driver’s side door and-drove away in Taylor’s car. Taylor testified that her wallet was in her car and contained her driver’s license, her Social Security card, and some cash. After the assailant drove away, Taylor stated that she used her phone, which was -still in her possession, to call the police.
¶ 67. Taylor also testified that, following the robbery and carjacking, Miller borrowed a cell phone and placed a call. She stated that, about forty-five minutes after Miller made the call, a man named Adams drove down the street and returned her car. Taylor testified, however, that Adams was not the same man who robbed and carjacked her. Officer Loretta Watts, who responded to Taylor’s 911 call and was at the scene when Adams returned Taylor’s car, testified that Miller said he knew the man who robbed and carjacked Taylor. Officer Watts further testified, however, that Miller never revealed to her the assailant’s name. Instead, Officer Watts said that Miller contacted Adams, who ended up returning Taylor’s car.
¶ 68. At ■ trial, Taylor testified that she told the police the assailant was an African American man between 5’6” and six-feet tall, that he weighed no more than 200 pounds, and that he carried a black' hand *877 gun. Taylor further stated that the assailant wore a black and white jacket, jeans, a hoodie, and a black and white bandana over his face. Although the bandana initially covered the assailant’s face, Taylor stated that she got a good look at him when he returned to the driver’s side of the car after speaking to Miller. Not only had the bandana slipped down to the man’s neck, but Taylor also testified that Miller’s house had a motion-activated floodlight that shone on the assailant’s uncovered face as he walked back to the driver’s side door.
¶ 69. Detective Melvin Williams investigated the armed robbery and carjacking involving Taylor. Detective Williams testified that he worked another case in which White and a codefendant, Stamps, were arrested. Through his investigation, Detective Williams learned that White lived at 933 Carnation Street. Detective Williams further stated that Stamps had Taylor’s Social Security card in his possession at the time of his arrest. As a result, Detective Williams showed Taylor one photo lineup that included White’s picture and a second photo lineup that included Stamps’s picture. Detective Williams showed Taylor the lineups the day after she was robbed and carjacked. Upon seeing the photos, Taylor positively identified White as the gunman. Detective Williams further testified that, on a separate occasion, he showed the same photo lineups to Miller, who also identified White as the man who robbed and carjacked Taylor at gunpoint.
f. Bailey’s Stolen Vehicle
¶ 70. Bailey testified that she was robbed and carjacked at gunpoint sometime between midnight and 1 a.m. on April 22, 2013. Bailey testified that she had driven to an apartment complex to drop off her friend, Younger, and Younger’s three-year-old son. While helping Younger unload her belongings from the vehicle, Bailey noticed two young African American men walk by the car. Bailey testified that the two men doubled back toward the car and that each man now held a gun. Bailey stated that one man pointed a black gun at her while the other man pointed a gun at Younger. As instructed, Bailey and Younger gave the men their purses, and Bailey handed the men the car keys to her black 2009 Hyundai Sonata. Although the men initially planned to drive off with Younger’s three-year-old son in the backseat, Bailey testified that they changed their minds and allowed Younger to grab her son.
¶ 71. Although Younger later positively identified one of the assailants, Bailey stated that she was unable to do so due to the hoodies the men wore. Bailey did testify, however, that one of the men had dreadlocks. Bailey further testified that the police contacted her two days after the incident on April 24, 2013, to report that they had recovered her car and that her car keys had been found in White’s possession.
¶ 72. According to the testimony of Officer Adelbert Moore, he received a dispatch call on April 24, 2013, about the possible location of Bailey’s stolen vehicle. Officer Moore testified that several units arrived at the location and then followed the vehicle as it drove away. The driver of the vehicle increased his speed, and the officers pursued the vehicle until it stopped near an apartment building. Officer Moore stated that two men exited the vehicle and fled on foot. Officer Moore testified that the driver of the vehicle was around 5’2” to 5’3” and that the passenger was around 5’10” to 5’11”. Officer Mpore further testified that he- recognized the driver of the car as White. Officer Moore and the other officers pursued White and his passenger on foot and apprehended the men a short time later. After apprehending the two men, the officers identified the passenger *878 of the vehicle as Stamps. While conducting a safety search, Officer Moore found a Social Security card belonging to Taylor in Stamps’s possession. In White’s possession, Officer Moore found a set of car keys that White claimed belonged to his girlfriend. Officer Moore testified, however, that the keys unlocked Bailey’s stolen car, which the officer had just seen White driving.
g. Audio Recordings
¶ 73. On May 5, 2015, prior to opening statements on the first day of White’s trial, and outside the jury’s presence, the State informed the circuit court and the defense that it had just received several audio recordings from Detective West, who investigated the armed robberies and armed carjackings of Penman, Davis, and Thomas. As the record reflects, Detective West was scheduled to be one of the State’s first witnesses on; the first day of trial. The State explained that the tapes recorded seven conversations between White and his girlfriend while White was incarcex-ated in the Simpson County Jail. Subject to the defense’s review of the audio tapes, the State moved to admit the tapes into evidence.
¶ 74. The circuit court granted a recess to give the defense an opportunity to review the audio tapes. See URCCC 9,04. After reviewing the tapes, the defense- argued that the State had committed a blatant discovery violation and that the circuit court should preclude the use of the tapes. In the event that the circuit court decided to admit the tapes, the defense asked for a mistrial. Alternatively,' the defense asked for a continuance to reevaluate how it should best proceed in light of the State’s revelation of the audio tapes. The defense further argued that a majority of the content of the audio tapes was completely irrelevant and inadmissible.
¶ 75. After considering the parties’ arguments, the circuit court denied the defense’s request for a mistrial or a continuance and gave the State an opportunity to lay a proper foundation to admit specific portions of the tapes. The State called Detective Williams, who not only obtained the tapes from the Simpson County Sheriffs Department but also helped with the investigations involving Bailey’s and Taylor’s stolen vehicles. Following the State’s proffer of Detective ’Williams’s testimony, the circuit court admitted certain portions of the seven recordings.
¶ 76. During the trial, Detective Williams testified about the contents of the tapes and how he obtained the tapes. Detective Williams stated that he received a phone call from Captain Williams of the Simpson County Sheriffs Department about recorded conversations involving White. After listening to the recordings over the phone, Detective Williams and Detective West traveled on April 26, 2013, to retrieve the audio tapes. Detective Williams testified that the audio tapes contained a recorded conversation between White and his girlfriend, with Stamps’s vpice audible in the background of the conversation. In addition to stating that he recognized both White’s and Stamps’s voices after listening to the recording, Detective Williams testified that White was mentioned by name on the recording.
¶ 77. In accordance with its px*ior ruling, the circuit court allowed the State to admit into evidence and play for the jury certain portions of the audio-taped conversation. After the jury listened to the recordings, Detective Williams provided further testimony about the substance of the record.ings. As Detective Williams testified, the audio tapes recorded White having a conversation with ’his girlfriend. While speaking with his girlfriend, White successfully guided her to a location where two guns *879 were hidden. One of the guns White’s girlfriend retrieved was black, which White identified during the conversation as his gun. After White’s girlfriend retrieved his gun, White asked Stamps about the second gun’s location. Soon after Stamps’s response, White’s girlfriend was able to locate the second gun, which White stated belonged to “Islam.” White also discussed getting caught by the police after driving a stolen car. Based on what he heard after listening to the recordings, Detective Williams testified that he felt the evidence was pertinent to both his and Detective West’s investigations.
h. Defense’s Case-in-Chief
¶78. During its case-in-chief, the defense called Adams as a witness. Adams testified that he received a call from Miller the night of April 23, 2013, following the armed robbery and armed carjacking involving Taylor. As the jury heard during the State’s case-in-chief, Miller placed a phone call to Adams after the crime occurred, and Adams subsequently arrived at the scene to return Taylor’s stolen car.
¶ 79. According to Adams, after receiving Miller’s call the night of April 23, 2013, he (Adams) met someone named “Vontae” at a gas station to retrieve Taylor’s car. Adams testified that he did not really know “Vontae” but had seen him around “the neighborhood.” Adams testified that, at their gas-station meeting the night of April 23, 2013, “Vontae” gave Adams the car keys to Taylor’s car and told Adams where to find the car. Adams stated that no one else accompanied ‘Vontae” to the gas station. Adams further stated that, at the time he met “Vontae” at the gas station, he did not know White but had since come to know White as “K.D.” After leaving from his gas-station meeting with “Vontae,” Adams - testified that he retrieved Taylor’s car and then drove to Miller’s house, where the police ended up arresting him for marijuana possession.
¶ 8G. The defense also called Islam Wilson as a witness. In response to the defense’s question as to whether he had committed the armed robberies and armed carjackings involving Penman, Davis, Thomas, and Taylor, Wilson invoked his Fifth Amendment privilege against self-incrimination. On cross-examination by the State, Wilson testified that he knew White as “K.D.” and that he knew White’s girlfriend. However, he again invoked his Fifth Amendment privilege when questioned about the last time he had spoken to White or White’s girlfriend. Wilson also invoked his privilege when asked whether he had spoken to White, White’s girlfriend, or any of White’s family or friends about the case against White.
i. White’s Convictions, Sentencing, and Appeal
¶ 81. After considering the evidence and testimony, the jury found White guilty of the following: Counts I and II, the armed robbery and armed carjacking of Penman; Counts V and VI, the armed robbery and armed carjacking of Thomas; and Count IX, possession of stolen property. As to the remaining counts charged in the indictment (Counts III and IV, the armed robbery and armed carjacking of Davis, and Counts VII and VIII, the armed robbery and armed carjacking of Taylor), the circuit court declared a mistrial after the jury failed to render a verdict. The circuit court then sentenced Wdiite to serve separate twenty-five-year sentences for each armed-robbery conviction and for each armed-carjacking conviction and to serve a'ten-year sentence for the conviction of possession of stolen property. The circuit court ordered all five sentences to run concurrently with one another and to be served *880 in the custody of the Mississippi Department of Corrections (MDOC).
¶ 82. White filed an unsuccessful motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Aggrieved by his convictions and sentences, White appeals.
DISCUSSION
I. Whether the circuit court erred by refusing White’s request for a continuance on the first day of trial.
¶ 83. ■ Prior to opening statements in White’s trial, the State informed the circuit court and the defense that it had just received audio recordings it wished to offer into evidence. White asserts that, the State’s disclosure resulted in a discovery violation that unfairly surprised him and prejudiced his defense. White further argues that the circuit court abused its discretion by denying his motion for a continuance.
¶ 84. This Court reviews a trial court’s denial of a motion for a continuance for abuse of discretion. Flaggs v. State, 999 So.2d 393, 399 (¶ 16) (Miss. Ct. App. 2008). “An abuse of discretion does not constitute reversible error unless a substantial right of a party has been adversely affected.” Id. at 405 (¶35) (citation omitted). Where a party alleges that a discovery violation has occurred at trial, the trial court must follow the procedure established by Rule 9.04:
If[J during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
1. Grant the. defense a reasonable op.-portunity to .,. examine the newly produced documents, photographs or other evidence; and
2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice'and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the nondisclosed evidence or grant a ■ mistrial.
URCCC 9.04.
¶ 85. On appeal, White does not appear to argue that the circuit court failed to follow Rule 9.04. Instead, as previously stated, he argues that the circuit court incorrectly exercised its discretion when the court denied his. motion for a continuance, According to White, the State’s disclosure on the first day of trial amounted to a discovery violation that “entitled [him] to a mistrial or a continuance to reevaluate [his] case and [to] prepare to meet the newly disclosed evidence.” The defense argued before the circuit court that a continuance was necessary to reevaluate how it should proceed in light of the State’s revelation of the newly disclosed audio tapes. In addition, to arguing that the State committed a blatant discovery.violation, the defense asserted that a majority, of the tapes’ contents was irrelevant and inadmissible.
¶ 86. Unlike the majority, upon review, I find the circuit court followed Rule 9.04 when it. exercised its discretion and refused to grant the defense a continuance based on the alleged discovery violation. As the record reflects,, following the State’s disclosure- of the audio tapes, the circuit court granted the defense a recess to review the newly disclosed evidence. After reviewing the tapes,- the defense asserted that -the State had committed a *881 discovery violation, and the defense objected to the admission of the tapes. In the event that the circuit court determined the tapes to be admissible, the defense requested a mistrial or a continuance. However, the circuit court denied the defense’s motion and allowed the State an opportunity to lay a proper foundation for the admission of the tapes. After finding that the State properly laid a foundation, the circuit court ruled that certain portions of the audio tapes were admissible. As the record ■reflects, .the defense never asserted that new witnesses or evidence were needed as a result of the audio tape. Because I find no abuse of discretion in the circuit court’s denial of the defense’s request for a continuance, I find this assignment of error lacks merit. Accordingly, I will address the merits, of White’s remaining assignments of error.
II. Whether the circuit court erred by admitting lay-witness testimony about the alleged location of a victim’s cell phone.
¶ 87. White next argues that the circuit court erred by allowing Penman and Detectives West and Williams to testify about the app Penman used to determine the possible location of his stolen phone. White asserts that the circuit court improperly allowed the State’s lay witnesses to provide expert testimony “purporting to pinpoint the location of Penman’s stolen cell phone to White’s address.” White further contends that this improper testimony prejudiced him “because [the testimony] connected him with Penman’s stolen cell phone, making it more likely in the jurors’[ ] eyes that Penman’s photo identification was correct and that White was the man who robbed Penman.”
¶ 88. This Court reviews the circuit court’s admission or exclusion of evidence •for abuse, of discretion. Collins v. State, 172 So.3d 724, 738-39 (¶ 14) (Miss. 2015). With regard to the differences between lay testimony and expert testimony, the Mississippi Supreme Court has explained:
Mississippi Rule of Evidence 701 provides that lay witnesses may give opinion testimony so long as that testimony is “not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.” M.R.E. 701. Rather, any opinion testimony by a lay witness must be “rationally based on the perception of the witness.” Id. Rule 702 provides that “if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise[.]” M.R.E. 702.
Id. at 739 (¶ 15). “[W]here, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a [Rule] 702 opinion and not a 701 opinion.” Id. at (¶ 16) (quoting Langston v. Kidder, 670 So.2d 1, 3-4 (Miss. 1995)).
¶ 89. In Collins, the supreme .court addressed an issue of first impression: whether ■ cell-phone location technology constitutes expert or lay- testimony under Mississippi caselaw. Id. at 739 (¶ 14). The Collins court held:
[Testimony that simply describes the information in a cell[-]phone record is properly lay testimony. Likewise, testimony that merely informs the jury as to the location of cell[-]phone towers may properly be lay testimony when it is based upon the personal observations of the witness. But testimony that goes beyond the simple descriptions of cell[-]phone basics, specifically testimony that purports to pinpoint the general area in which the cell[-]phone user was *882 located based on historical cellular data, requires scientific, technical, or other specialized knowledge that requires expert testimony.
Id. at 743 (¶ 28).
¶ 90. Upon review of the record and relevant caselaw, I find the disputed trial testimony constituted proper lay-witness testimony. Over the defense’s objection, Penman simply testified that he downloaded an app to notify him of his stolen phone’s location. Penman then testified that he received an email from the app the day after the crime and that the email provided coordinates for his phone’s purported location. Penman stated that he typed the coordinates into Google maps and discovered they were for a house around 932 or 933 Carnation Street. After discovering this information, Penman immediately forwarded the information to Detective West. Thus, rather than testifying about information based on “scientific, technical, or other specialized knowledge!;,]” the record reflects that Penman’s testimony remained limited to that information which “the average, randomly selected adult” would possess. See Collins, 172 So.3d at 739 (¶¶ 15-16).
¶ 91. During Detective West’s direct examination, the State asked how law enforcement attempted to locate Penman’s stolen vehicle. Detective West responded that they used “[a] phone that was taken.” Detective West subsequently explained that Penman had used an app to locate his phone and had then provided the information from the app to law enforcement. After receiving Penman’s information, law enforcement sent an officer to the location. As with Penman’s testimony, the record reflects that Detective West’s testimony also remained limited to information that “the average, randomly selected adult” would possess and that would not require any specialized knowledge or expertise. See id.
¶ 92. Finally, at a later point during its case-in-chief, the State asked Detective Williams whether he was familiar with the address of 933 Carnation Street—the same address about which Penman had earlier testified. After Detective Williams responded that he was familiar with the address, the State asked him to explain how he knew the address. Detective Williams then answered, “I’m familiar with [the address] due to the fact me and Detective West [are] assigned to the same unit. We were working ... together, and I can recall that he was telling me that one of his complainant’s cell phones was recovered at 933 Carnation Street.” The defense objected to Detective West’s statement as hearsay, but the circuit court overruled the objection. Detective Williams then further testified that White had also provided the address as his residence upon his arrest. Thus, as the record reflects, Detective Williams possessed personal knowledge of White’s address since White provided the address upon arrest. See M.R.E. 602 (“A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness’s own testimony.”).
¶ 93. Upon review, I find the record fails to reflect that the disputed testimony from Penman and Detectives West and Williams constituted improper expert testimony. I therefore find no abuse of discretion from the circuit court’s admission of the testimony. Accordingly, I find this assignment of error lacks merit.
III. Whether the circuit court erred by admitting testimony that violated White’s right to confrontation.
• ¶ 94. White next argues the circuit court erred by admitting Detective Williams’s *883 testimony that Miller, a nontestifying witness, had identified White as the person who robbed and carjacked one of the victims. White asserts that Miller’s statement to Detective Williams constituted testimonial hearsay. White further contends that the circuit court violated his right to confrontation by admitting Detective Williams’s testimony about Miller’s statement.
¶ 95. “This Court reviews a Confrontation Clause objection de novo.” Polk v. State, 205 So.3d 1157, 1160 (¶ 8) (Miss. Ct. App. 2016) (citing Beecham v. State, 108 So.3d 402, 404 (¶ 5) (Miss. Ct. App. 2011)). As this Court has previously explained:
The Confrontation Clause guarantees a criminal defendant the right to be confronted with the witnesses against him. In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that testimonial evidence could not be admitted against a criminal defendant unless the declarant was unavailable at trial, and the defendant had a prior opportunity to cross-examine him.
The Crawford Court indicated that a statement is likely to be determined testimonial if it was made with an eye toward using the statement at trial.
In Michigan v. Bryant, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the Supreme Court clarified the distinction between testimonial and nontesti-monial statements. The Supreme Court articulated the following rule: When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the primary purpose of the interrogation by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. If the court determines that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency, then the statements are nontestimonial and may be admitted pursuant to the rules of evidence. But if the primary purpose was to establish or prove past events potentially relevant to later criminal prosecution, then the statements are testimonial.
Bufford v. State, 191 So.3d 755, 759 (¶¶ 13-15) (Miss. Ct. App. 2015) (internal citations and quotation marks omitted).
¶ 96. In the present case, the jury heard testimony from Taylor, one of the victims, that she and Miller were sitting inside her car when someone robbed and carjacked her at gunpoint. Detective Williams investigated the crime. On separate occasions, Detective Williams showed Taylor and Miller photo lineups. Detective Williams stated that both Taylor and Miller identified White from the photo lineups. Taylor herself testified to this fact, but Miller never testified at White’s trial. The record reflects, however, that the defense neither raised an objection nor moved to strike Detective Williams’s testimony that Miller identified White from a photo lineup. In fact, on cross-examination, the defense further questioned Detective Williams about the photo lineup and Miller’s identification of White. Thus, this issue is barred from review on appeal absent plain error. See Willie v. State, 204 So.3d 1268, 1278 (¶ 28) (Miss. 2016).
¶97. In Willie, the supreme court explained:
We apply the plain-error rule only if a defendant’s substantive or fundamental rights are affected. Applying the plain-error rule, the Court must determine: (1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the *884 trial. Only if the error resulted in a manifest miscarriage of justice will reversal occur.
Willie, 204 So.3d at 1279 (¶ 29) (internal citations and quotation marks omitted).
¶98. Upon review, I find that, even if the circuit court, erred by-allowing Detective Williams’s testimony about Miller’s photo identification of White, White fails to show how the error prejudiced him. The jury heard testimony that Taylor also positively identified White from a photo lineup. Furthermore, Taylor herself testified at White’s trial and identified White in open court as the man who robbed and • carjacked her at gunpoint. Despite this testimony, however, the jury failed to reach a verdict on the two counts pertaining to Taylor’s armed robbery and carjacking. As a result, the circuit court declared a mistrial on these two counts. I therefore find that no manifest miscarriage of justice resulted. from the admission of Detective Williams’s testimony about Miller’s photo identification of White. Accordingly, I find this argument lacks merit.
IV. Whether the circuit court erred by failing to sua sponte sever the counts against White.
¶99. In his next assignment of error, White claims the circuit court erred by failing to sua sponte sever the nine counts charged in his indictment. This Court reviews a circuit court’s decision to grant or deny a severance for abuse' of discretion. See URCCC 9.03.
¶ 100. Pursuant to Mississippi Code Annotated section 99-7-2(1) (Rev. 2015), the same indictment may charge a defendant with separate counts for multiple offenses if “(a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.” However, upon a motion by either the State or the defense, a circuit court possesses the discretion to sever the offenses:
1. If before trial, it is deemed appropriate to promote a fair determination of the defendant’s guilt or innocence of each offense; or
2. If during trial, upon the consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant’s guilt or innocence of each offense.
URCCC 9.03. In determining whether severance is proper, the circuit court should consider the following factors: “(1) whether the time period between the [offenses] is insignificant; (2) whether the evidence proving each count would be admissible to prove each of the other counts; and (3) whether the crimes are interwoven.” Lomax v. State, 192 So.3d 975, 981 (¶ 31) (Miss. 2016).(citing Corley v. State, 584 So.2d 769, 772 (Miss. 1991)).
¶ 101. Prior to White’s trial, his attorney filed a motion in limine to sever the nine counts charged in his indictment. However, during the final pretrial-motions hearing, White’s attorney withdrew the motion to sever after White advised him that he did not wish to proceed on the motion. On appeal, though, White asserts that the circuit court committed plain error by failing to sua sponte sever the counts charged in his indictment.
¶ 102. As. previously discussed, this Court only applies the plain-error rule when a defendant’s substantive or fundamental rights have been affected. Willie, 204 So.3d at 1279 (¶ 29). After considering both the record and relevant caselaw, I find no such error here that affects either White’s substantive or fundamental rights. As a result, I find no merit to White’s argument that the circuit court erred by *885 failing to sua sponte sever the counts charged in his indictment.
Y. Whether the circuit court erred by denying White’s motion to admit evidence of an audio-taped conversation.
¶ 103. White next alleges that the circuit court erred by denying his motion in li-mine to admit a recorded telephone conversation he allegedly had with. Wilson. “The relevancy and admissibility of .evidence are largely within the discretion of the trial court .... Unless the trial judge’s discretion is so abused as to.be prejudicial to a party, this Court will not reverse his ruling.” Ratliff v. State, 752 So.2d 416, 420 (¶ 11) (Miss. Ct. App. 1999) (citation omitted).
¶ 104. At the pretrial-motions hearing, the defense stated that, during White’s incarceration, his father helped him secretly record a telephone conversation with Wilson. The defense admitted that portions of the recording were unintelligible. However, the defense asserted that other portions 'of the recording were intelligible and clearly supported the defense’s theory that Wilson committed the crimes charged against White. As &' result, White’s attorney argued the recording was relevant and should be admitted into evidence if authenticated.
¶ 105. After listening to the audio recording, the circuit court ruled as follows:
Upon review of the audiotape, the [c]ourt finds that much of the audiotape is unable to be heard. There are portions of the tape where the [cjourt can somewhat decipher what is being said[,] but much of it is not clear. If the [cjourt could hear the whole recording and determine what [the] two individuals [were] talking about[,] then it possibly would be relevant, but the [c]ourt cannot decipher the full context of what they were talking about[.] [Therefore, the [c]ourt find that [the recording] is not relevant. If it were relevant, then we would have hearsay issues with respect to the recording. There’s no one to say specifically who was on the other end of the conversation. We do know that it is purported to be Islam Wilson[,] and that is what the person [who] would authenticate the tape would say[,] but that would be hearsay.
Based on its findings regarding the inability to hear or authenticate the audio recording, the circuit court denied White’s motion to admit the recording. '
¶ 106.'As a predicate to admission, the proponent of a recording must prove the recording is “relevant as defined by [Mississippi Rule of Evidence] 401, as well as authentic as required by [Mississippi Rule of Evidence] 901.” Ratliff, 752 So.2d at 420 (¶ 13) (citing Ragin v. State, 724 So.2d 901, 903 (¶ 3) (Miss. 1998)). “The recording passes the relevancy test of Rule 401 if it has a ‘tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.’” Id. (quoting M.R.E. 401). The recording also satisfies the authenticity test of Rule 901 where “evidence is introduced which is ‘sufficient to support a finding that the matter in question is what its proponent claims.’ ” Id. at 421 (¶ 15) (citing Ragin, 724 So.2d at 903 (¶ 6)). I also acknowledge that “[t]he mere fact that portions of ... a recording are inaudible does not render [the recording) per se inadmissible.” Oatis v. State, 726 So.2d 1230, 1235 (¶ 25) (Miss. Ct. App. 1998) (quoting Middlebrook v. State, 555 So.2d 1009, 1012 (Miss. 1990)).
¶ 107. In the present case, I find White fails to meet his burden to demonstrate the audio recording’s relevancy and authenticity, as required by the Mississippi *886 Rules of Evidence. See M.R.E. 401, M.R.E. 901. After listening to the audio recording, the ■ circuit court specifically found that White failed to meet the predicate requirements for admission. The circuit court stated that much of the tape was unintelligible and that, as a result, White could not prove the tape’s relevancy. Furthermore, the circuit court found that hearsay issues existed with respect to the audio recording and that White failed to produce anyone to authenticate the tape. Thus, based on a review of the record, I find no abuse of discretion from the circuit court’s exclusion of the tape. I therefore would refuse to reverse the circuit court’s ruling on this issue.
YI. Whether the circuit court illegally sentenced White to serve ten years for possession of stolen property.
¶ 108, In his next assignment of error, White claims the circuit court illegally sentenced him “to serve ten (10) years for Count IX (possession of stolen property) instead of five (5) years pursuant to Mississippi Code Annotated [s]ection 97-17-70(4) (Rev. 2014).” This Court reviews an assertion regarding an illegal sentence for abuse of discretion. Long v. State, 52 So.3d 1188, 1195 (¶ 26) (Miss. 2011). “[T]he general rule in this state is that a sentence cannot be disturbed on appeal so long as it does not exceed the maximum term allowed by statute.” Id. (citation omitted).
¶ 109. On August 21, 2013, the grand jury indicted White for possession of stolen property in violation of section 97-17-70. The indictment charged that the value of the stolen property was “in excess of [$500.]” At the time of White’s indictment, the applicable version of section 97-17-70(3) provided that any person “who shall be convicted of receiving stolen property which exceeds Five Hundred Dollars ($500.00) in value shall be committed to the custody of the State Department of Corrections for a term not exceeding ten (10) years or by a fine not more than Ten Thousand Dollars ($10,000.00) or both.” Miss. Code Ann. § 97-17-70(3) (Rev. 2006) (emphasis added).
¶ 110. White’s trial began on May 4, 2015. Between the dates of his indictment and his trial, the Legislature amended section 97-17-70 as follows:
Effective July 1, 2014, [s]ection 97-17-70 changed to provide that the value of the stolen property be “One Thousand Dollars ($1,000.00) or more, but less than Five Thousand Dollars ($5,000.00).” Miss. Code Ann. § 97-17-70(4) (Rev. 2014). The penalty for that offense was changed to “imprisonment in the custody of the State Department of Corrections for a term not exceeding five (5) years or by a fine of not more than Ten Thousand Dollars ($10,000.00) or both.” Id.
Wilson v. State, 194 So.3d 855, 867 (¶ 40) (Miss. 2016) (emphasis added).
¶ 111. To comply with the statutory amendment to section 97-17-70, the State moved during White’s trial to amend the value of the stolen property charged in Count IX of his indictment. Thus, instead of stating that the value of the property exceeded $500, the amended indictment charged that the property’s value was between $1,000 and $5,000. The defense raised no objection to the State’s motion, and the circuit court accordingly granted the amendment to White’s indictment. The circuit court also granted a jury instruction that reflected the valuation change made to Count IX of the indictment.
¶ 112. Following the trial, the jury found White guilty of Count IX. During sentencing, the circuit court sentenced White pursuant to the version of section 97-17-70 applicable at the time of his indictment even though the court had previously allowed the State to amend the value of the *887 stolen property to comply with the newer, more lenient version of the statute. Pursuant to the version of section 97-17-70 applicable at the time of White’s indictment, the circuit court sentenced White to serve ten years in MDOC’s custody. See Miss. Code Ann. § 97-17-70(3) (Rev. 2006). On appeal, however, White argues the circuit court erred by not sentencing him under the newer, more lenient version of section 97-17-70 that became effective in July 2014.
¶ 113. Mississippi Code Annotated section 99-19-1 (Rev. 2015) provides:
No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, unless otherwise specially provided in such statutes.
¶ 114. In Wilson, the supreme court addressed the same issue that White now raises before this Court. Wilson, 194 So.3d at 867 (¶ 41). In discussing whether the trial court in Wilson erred by sentencing the defendant under the older version of section 97-17-70 rather than the subsequent, more lenient version, the supreme court emphasized:
The ... statutory language of [section 99-19-1] provides that no new statutory enactment shall defeat the prosecution of a crime committed before the enactment of the new statute. Moreover, ... [sjection 99-19-1 continues by mandating—again by using the word “shall”— that all laws prescribing punishment for a crime remain in effect for the purpose of ascribing punishment “unless otherwise specially provided” in a newly enacted statute.
Id. at 867-68 (¶ 42) (quoting Miss. Code Ann. § 99-19-1). ’Concluding that “[section 99-19-1 clearly requires the trial court to sentence an offender under a sentencing statute in place at the time of the crime[,]” the Wilson court held that the trial court properly sentenced the defendant under the older version of section 97-17-70 applicable at the time he was indicted. Id. at 874 (¶ 61).
¶ 115. Upon review, I find the supreme court’s recent decision in Wilson controls as to which version of the sentencing statute properly applied in the present case. As Wilson clearly establishes, White’s sentencing fell under the domain of the prior version of section 97-17-70 since that version applied at the time of White’s indictment. I therefore find no merit to White’s argument that the circuit court illegally sentenced him under the older, version of the statute. .
VII. Whether White’s statutory right to a speedy trial was violated.
¶ 116. After discussing White’s assertion: that his- statutory right to a speedy trial was violated, the majority concludes that White waived his statutory claim and that his argument lacks merit. Because I agree with the majority on this point, I decline to further address this assignment of error in my dissent.
VIII. Whether insufficient evidence existed to support the verdicts for Counts I, II, V, and VI, or alternatively, whether the verdicts for Counts I, II, V, and VI were against the overwhelming weight of the evidence.
¶ 117. In his final assignment of error, White attacks the sufficiency and, alter *888 natively, the weight of the evidence supporting his convictions for each of the following: Count I, the armed robbery of Penman; Count II, the armed carjacking of Penman; Count V, the armed robbery of Thomas; and Count VI, the armed carjacking of Thomas.[15]
¶ 118. The majority addresses. White’s argument that insufficient evidence supported his convictions. Like the majority, I find this assertion lacks merit. The majority does not, however, address White’s argument regarding the weight of the evidence. As a result, I will briefly discuss that assignment of error.
¶ 119. “The standard for reversing a jury’s verdict as against the overwhelming weight of the evidence is very high.” Collier v. State, 183 So.3d 885, 893 (¶ 34) (Miss. 2016) (citation omitted). This Court views all the evidence in the' light most favorable to the State, and we only reverse if “the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that a reasonable jury could not have found beyond- a reasonable doubt that the defendant was guilty.” Id. (citation omitted). “When a reasonable jury could not have found the defendant guilty beyond a reasonable doubt, then the verdict is so contrary to the overwhelming weight of the evidence that allowing it to stand would sanction.an unconscionable injustice.” Id. (citation and internal quotation marks omitted).
¶ 120. With regard to the armed robberies and carjackings involving Penman and Thomas, the jury heard testimony that the victims both got a clear look at their assailant. Penman and Thomas both picked White out of a photo lineup, and both victims testified at White’s trial that White was the man who robbed and carjacked them. Furthermore, Penman and Thomas both testified that White approached their cars with a gun drawn and demanded their personal belongings before driving away in their vehicles. - •
¶ 121. After viewing the evidence in the record in" the light most favorable to the State, I find the jury’s verdicts were not so contrary to the overwhelming weight of the evidence that allowing them to stand sanctions an unconscionable injustice. See id. As a result, I find that this issue also lacks merit.
¶ 122. For the foregoing .reasons, I would affirm White’s convictions and sentences. I therefore respectfully dissent from the majority’s opinion,
IRVING, P.J., AND GREENLEE, J., JOIN THIS OPINION.

. The jury later heard testimony from a detective investigating a separate armed robbery and armed carjacking that White lived at 933 Carnation Street.

. The offenses against Davis were charged as Counts III and IV of White's indictment. The circuit court ordered a mistrial as to these two counts after tjie jury failed to render a verdict.

. The offenses against Taylor were charged as Counts VII and VIII of White’s indictment. The circuit court ordered a mistrial as to-these two counts after the jury failed to render a verdict.

. As previously discussed, the circuit court ordered a mistrial as to the remaining counts charge in White's indictment after the jury failed to reach a verdict on those counts,