# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-01462-SCT

*MONTRELL CROFT a/k/a MONTREL LASHUN*
*CROFT a/k/a G-MONEY a/k/a MONTRELL*
*LASHAUN CROFT a/k/a MONTRELL L. CROFT*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT:                  09/07/2017
TRIAL JUDGE:                       HON. LESTER F. WILLIAMSON, JR.
TRIAL COURT ATTORNEYS:             KASSIE ANN COLEMAN
                                   LISA J. HOWELL
                                   STEPHEN PAUL WILSON
                                   THOMAS GOODWIN BITTICK
COURT FROM WHICH APPEALED: LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:            OFFICE OF STATE PUBLIC DEFENDER
                                   BY: HUNTER N. AIKENS
ATTORNEY FOR APPELLEE:             OFFICE OF THE ATTORNEY GENERAL
                                   BY: JOE HEMLEBEN
DISTRICT ATTORNEY:                 BILBO MITCHELL
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                       AFFIRMED IN PART; REVERSED AND
                                   REMANDED IN PART - 05/16/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Montrell Croft, a/k/a "G-Money," was convicted of "participating in or conducting or conspiring" in illegal gang activity, possession of a firearm by a felon, and attempted murder in Lauderdale County Circuit Court following a jury trial. Croft now appeals. The

Court finds that an instruction permitting a jury in a criminal case to find an element of a crime by a preponderance of the evidence constitutes plain error. Accordingly, we reverse and remand for a new trial on whether Croft "participat[ed] in or conduct[ed] or conspir[ed]" in criminal gang activity beyond a reasonable doubt. Croft's felon-in-possession and attempted-murder convictions and sentences are affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2. On September 23, 2015, Marcus Hall, a/k/a "Handy Dandy," was approached by a group of men including Croft, who witnesses testified was a ranking member of the "Rolling 60s Crips" gang. Croft told Hall, "you know you're fixing to die tonight; right?" Hall replied that he did not have a problem with the men. Another group including Kenzavion Woodard ("Kenza") approached Hall from a different direction. Kenza screamed Hall's name, then Croft shot Hall. Hall fell in a ditch as men in the groups continued to shoot at him. After firing multiple shots, the groups fled.

¶3. Hall received wounds to the abdomen and each thigh. A treating physician testified that any of the three wounds could have been fatal. Anthony Ball, a gang investigator with the Meridian Police Department, visited Hall in the hospital. Hall told Ball that "G-Money" was one of the shooters. Ball knew "G-Money" to be Croft. After Hall was released from the hospital, Ball had Hall look at group photos from the Rolling 60s Crips' Facebook page. Hall identified Croft as "G-Money" and identified three other assailants from the photos.

¶4. A grand jury returned a multicount, multidefendant indictment charging Croft and others with crimes related to the shooting of Hall. Count I charged Croft, Jimmy Marquez

2

Johnson ("Johnson"), Emmitt Jordan, Ernest Scott, and Kenza with participating in, conducting, or conspiring in illegal gang activity under Mississippi Code Sections 97-1-1 and 97-44-19 (Rev. 2014). Count II charged Croft with possession of a firearm by a convicted felon under Mississippi Code Section 97-37-5 (Rev. 2014). Count III charged Croft, Kenza, and Johnson with attempted murder under Mississippi Code Sections 97-1-7 and 97-3-19 (Rev. 2014).

¶5. Croft pleaded not guilty. His trial was set to proceed with Kenza and Johnson as codefendants. Croft petitioned for appointment of counsel, which was granted. Croft then filed a pro se motion for release on bond. Croft's court-appointed attorney, Marcus Evans, then filed a motion for discovery. Croft's trial was reset three times over the course of months for various reasons, including substitution of counsel after Croft sought Evans's dismissal. Croft's second court-appointed attorney, Stephen Wilson, filed a motion to set bail. The trial court denied the motion because Croft was already on bond for a drug-trafficking charge in Alabama.

¶6. Croft subsequently filed a demand for speedy trial. Croft then filed his responses to discovery along with a notice of alibi defense.[1] Croft's trial was reset after the withdrawal of cocounsel for Croft's codefendants, Kenza and Johnson. Croft filed a motion to dismiss the indictment for violation of his right to a speedy trial and, alternatively, a motion to sever

---

[1] Croft's notice of alibi defense stated that his girlfriend, Ze-allicia Johnson, would testify that she and Croft were at her home at 3907 10th Street, Meridian, Mississippi, at the time of the shooting. The State submitted that address did not exist, and the defense had not supplemented to provide a different address. During a pretrial hearing, the trial court held that it would not let Johnson testify to anything other than what was provided in the notice of alibi defense. Johnson did not testify.

his trial from those of his codefendants. The trial court denied Croft's motion to dismiss but severed Croft's trial.

¶7. The day before trial, Kenza accepted a plea deal and agreed to testify. Croft objected to Kenza's testifying, claiming unfair surprise. The trial court permitted Croft and the State to meet with Kenza and to obtain his statement prior to his testifying. After Croft obtained Kenza's statement, Croft claimed he needed to alter his trial strategy and call Ernest Scott and Emmitt Jordan, who previously had been disclosed as witnesses for Croft. Both witnesses were present in the courtroom awaiting Croft's trial. The trial court granted Croft's request to issue subpoenas for both but declined to grant a continuance. Croft failed to have either witness served with a subpoena, and he did not call Scott and Jordan or his alleged alibi witness.

¶8. The State offered four witnesses: the victim, Hall; Ball, an investigator from the Meridian Police Department; Kenza, one of Hall's assailants; and the emergency room physician who treated Hall. Hall testified to the facts discussed above, and he also provided an in-court identification of Croft.

¶9. Ball questioned about his investigation. Ball had been employed in law enforcement for twenty-two years and was assigned to the Meridian Police Department's Gang Unit. In addition to his on-the-job training and experience, he testified that he had specialized training in gang-related cases from the Mississippi Association of Gang Investigators ("MAGI"). Ball testified that he attends a MAGI conference each year to obtain recertification as a gang investigator. He testified that he knew Croft and provided an in-court identification of him.

4

¶10. Ball testified that the victim, Hall, was a "hang-around" with the Black Disciple gang, meaning he was friends with Black Disciples but was not an actual member. When the State questioned Ball about whether the Black Disciples and the Rolling 60s Crips were rivals, he testified that "[t]hey're not friends. They are rivals. They been—I don't quite understand what they beefing about all the time, but they just always into it." The State then questioned Ball about his personal knowledge of whether Croft was affiliated with any particular gang. Ball testified that he had known Croft for six or seven years and that it was common for him to keep up with who was associated with what gang. Ball stated, "I have talked to Montrell Croft on several occasions, and he is firm—believe me, he will tell you he's a 60 Crip."

¶11. The State asked Ball his opinion on what had prompted the shooting. The following colloquy took place:

> Q: Based on your information of knowing that the victim, Marcus Hall, regularly associated with people that were [Black Disciple] and knowing that Montrell Croft was a [Rolling 60s Crip]; what, if anything, did you determine about this case and what prompted it?
>
> . . . .
>
> [Ball]: It can be a guess or a theory that they was into it with the [Black Disciples] and they thought Marcus was one and saw him and shot him.
>
> . . . .
>
> [Croft's attorney]: Your Honor, at this juncture, then I'd also impose an objection to the extent that this may enter into expert testimony and that he was not disclosed as an expert in discovery.
>
> BY THE COURT: That again is overruled. He's not tendered as an expert. He's tendered as somebody that's been involved in the gang investigations in this community since 2013. You may proceed.

5

Q. Investigator Ball, based on your determination that this case was gang-related; what, if any, charges did you file against Montrell Croft?

A. Under the Street Gang Act, the attempted murder.

. . . .

Q. And based on your investigation, everybody that you talked to and all the investigation that you did, did you believe that it was motivated as a result of this gang rivalry?

A. Yes, ma'am.

¶12. Kenza was called to testify on the second day of trial. Kenza's testimony was consistent with Hall's testimony about what occurred before and during the shooting. Kenza testified that the shooting began after he, Croft, and others observed Hall wearing orange, a color associated with the "Hoover Crips" gang. Kenza testified that they believed Hall was trying to sneak up on them because the Hoover Crips and the Rolling 60s Crips were "beefing" with each other. Kenza later testified that he had also tried to shoot Hall because Hall was a Black Disciple but that his gun would not fire. Kenza testified that he tried to shoot Hall because he wanted to "try to get some stripes off [of Hall]," which would have entitled him to a higher ranking in his gang.

¶13. Following the doctor's testimony, the State rested. Croft moved for a directed verdict and judgment as a matter of law on Counts I and III. The trial court denied Croft's motion.

¶14. A total of twenty-one jury instructions were given. The trial court gave the following jury instruction detailing the elements of the crime of participating in or conducting criminal gang activity:

6

The Court instructs the Jury that the Defendant has been charged with Participating in or Conducting Criminal Street Gang Activity in Count I. If you find from the evidence in this case beyond a reasonable doubt that:

1) On or about September 23, 2015, in Lauderdale County, Mississippi;

2) The defendant, MONTRELL LASHUN CROFT, AKA "G-MONEY," individually or while aiding and abetting and/or acting in concert with another,

3) did willfully, unlawfully, feloniously, and intentionally conspire, direct, participate, conduct, further, or assist in the commission of illegal gang activity by purposely and/or knowingly attempting to murder Marcus Devon Hall, with a firearm, by shooting him

then it is your sworn duty to find said Defendant, MONTRELL LASHUN CROFT, AKA "G-MONEY," guilty of Participating in or Conducting Criminal Street Gang Activity in Count I.

Should the State fail to prove any one or more of these essential elements beyond a reasonable doubt, then you shall find said Defendant not guilty of Participating in or Conducting Criminal Street Gang Activity in Count I.

¶15.    To define "gang," the State offered the following jury instruction, which tracks the

language of Mississippi Code Section 97-44-3(a) (Rev. 2014):

The Court instructs the Jury that for the purpose of this trial "Streetgang" or "gang" or "organized gang" or "criminal streetgang" means any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of three (3) of more persons with an established hierarchy that, through its membership or through the agency of any member, engages in felonious criminal activity.

It shall not be necessary for the State to show that a particular conspiracy, combination or conjoining of persons possesses, acknowledges or is known by any common name, insignia, flag, means of recognition, secret signal or code, creed, belief, structure, leadership or command structure, method of operation or criminal enterprise, concentration or specialty, membership, age or other qualifications, initiation rites, geographical or territorial situs or boundary or location, or other unifying mark, manner, protocol or method of expressing or indicating membership when the conspiracy's existence, in law or in fact, can be demonstrated *by a preponderance of the competent*

7

*evidence.* However, any evidence reasonably tending to show or demonstrate, in law or in fact, the existence of or membership in any conspiracy, confederation or other association described herein, or probative of the existence of or membership in any such association, shall be admissible in any action or proceeding brought under the Criminal Street Gang Act of Mississippi.

(Emphasis added.) The trial court granted this instruction without objection from Croft's trial attorney.

¶16. The jury found Croft guilty on all counts. After a sentencing hearing, the trial court sentenced Croft to twenty years in the custody of the Mississippi Department of Corrections ("MDOC"), with ten years suspended and five years of post-release supervision on Count I, ten years in the custody of MDOC on Count II, and thirty years in the custody of MDOC, with ten years suspended and five years of post-release supervision on Count III. The trial judge ordered each sentence to be served consecutively. Croft filed a motion for a new trial, which was denied. Croft appealed.

## ISSUES

¶17. Croft raises three issues:

I. Whether the trial court plainly erred in instructing the jury that the gang's existence could be demonstrated by a preponderance of the evidence.

II. Whether the trial court erred by allowing the gang investigator to offer improper expert testimony.

III. Whether the trial court erred by declining to grant Croft a continuance after learning that a codefendant would testify against him.

## DISCUSSION

**I.    Jury Instruction**

8

¶18.    "This Court must review jury instructions as a whole to ascertain whether the jury was fully and fairly instructed regarding the applicable law." *White v. State*, 195 So. 3d 765, 768 (Miss. 2016) (citing *Conner v. State*, 138 So. 3d 143, 149 (Miss. 2014)). "We will not find error if the instructions fairly, though not perfectly, announce the applicable rules of law." *Id.* (quoting *Conner*, 138 So. 3d at 149). "If the instructions, read as a whole, fairly announce the law of the case and create no injustice, no reversible error will be found." *Windless v. State*, 185 So. 3d 956, 960 (Miss. 2015) (citing *Harris v. State*, 861 So. 2d 1003, 1014 (Miss. 2003)).

¶19.    Croft argues, for the first time on appeal, that the trial court erred by instructing the jury that the existence of a gang could be demonstrated by a preponderance of the evidence. Because the jury instruction was not challenged in the trial court proceedings, Croft argues that this Court should reverse under the plain-error doctrine. He argues that the instruction "seriously affected the fairness, integrity, or public reputation of judicial proceedings," *inter alia*. *Fitzpatrick v. State*, 175 So. 3d 515, 521 (Miss. 2015) (quoting *Flowers v. State*, 158 So. 3d 1009, 1043 (Miss. 2014), *cert. granted, judgment vacated by Flowers v. Mississippi*, 136 S. Ct. 2157, 195 L. Ed 2d 817 (2016)).

¶20.    The jury instruction at issue tracked the language of Mississippi Code Section 97-44-3(a). The statute includes the following pertinent language:

> For purposes of this chapter, it shall not be necessary to show that a particular conspiracy, combination or conjoining of persons possesses, acknowledges or is known by any common name, insignia, flag, means of recognition, secret signal or code, creed, belief, structure, leadership or command structure, method of operation or criminal enterprise, concentration or specialty, membership, age or other qualifications, initiation rites, geographical or

9

territorial situs or boundary or location or other unifying mark, manner, protocol or method of expressing or indicating membership when the conspiracy's existence, in law or in fact, *can be demonstrated by a preponderance of the competent evidence*. However, any evidence reasonably tending to show or demonstrate, in law or in fact, the existence of or membership in any conspiracy, confederation or other association described herein, or probative of the existence of or membership in any such association, shall be admissible in any action or proceeding brought under this chapter.

Miss. Code Ann. § 97-44-3(a) (emphasis added).

¶21.    The State now confesses that the jury instruction was given in error, but it insists that the error was harmless.  The State directs the Court to another instruction, C-16, which instructed the jury on the appropriate standard of proof—beyond a reasonable doubt—for the charge of "participating in or conducting or conspiring" in illegal gang activity under Count I.  The State argues that C-16 cured the confessed error.  Indeed, C-16 clearly and emphatically instructed the jury that the State was required to prove each and every element of Count I beyond a reasonable doubt.

¶22.    Although the jury instruction at issue was a near-verbatim replication of Mississippi Code Section 97-44-3(a), the Court finds that the instruction, as given, "seriously affected the fairness, integrity, or public reputation of judicial proceedings," because it allowed the jury to find the existence of a gang by a preponderance of the evidence, instead of beyond a reasonable doubt.  ***Fitzpatrick***, 175 So. 3d at 521 (quoting ***Flowers***, 158 So. 3d at 1043).

¶23.    Section 97-44-3(a) is included in the Mississippi Streetgang Act, which provides both civil and criminal causes of action.  *See* Miss. Code Ann. §§ 97-44-1 to -19 (Rev. 2014).  The definition section begins with stating that for purposes of the chapter, the "words and phrases shall have the meanings ascribed herein, *unless the context clearly*

10

*requires otherwise*[.]" Miss. Code Ann. § 97-44-3 (emphasis added). A jury instruction that tracks the language of Section 97-44-3(a) (as was the case here) would be valid in civil actions, but such an instruction fails to pass muster in criminal proceedings. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). "The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense." *Alleyne v. United States*, 570 U.S. 99, 107, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013) (citing *United States v. O'Brien*, 560 U.S. 218, 130 S. Ct. 2169, 176 L. Ed. 2d 979 (2010)).

¶24. Here, Croft was charged with "participating in or conducting or conspiring" in illegal gang activity under Mississippi Code Section 97-44-19. To find Croft guilty, the jury was required to find, *inter alia*, that the State proved beyond a reasonable doubt that Croft "intentionally direct[ed], participate[d], conduct[ed], further[ed], or assist[ed] in the commission of illegal gang activity" under Mississippi Code Section 97-44-19(1). Yet the jury received a conflicting instruction that the gang's existence need not be proved beyond a reasonable doubt but that the gang's existence could be demonstrated by a preponderance of the competent evidence. The existence of a gang is clearly a fact constituting an "element" or "ingredient" of "participating in or conducting or conspiring" in illegal gang activity; therefore, the gang's existence was required to be proved to the jury beyond a reasonable doubt. *Alleyne*, 570 U.S. at 109.

¶25. The State's harmless-error argument is unavailing. "We have said that the rule which requires that all instructions should be read together 'does not cure an erroneous instruction in conflict with a proper instruction on a vital issue where the proper instruction does not modify or clarify the erroneous instruction.'" ***Banyard v. State***, 47 So. 3d 676, 684 (Miss. 2010) (quoting ***McHale v. Daniel***, 233 So. 2d 764, 768 (Miss. 1970)).

> The giving of an erroneous instruction containing reversible error cannot be cured by the giving of an inconsistent and correct instruction. . . . A material error in an instruction, complete in itself, is not cured by a correct statement of law in another instruction, for the jury cannot know which instruction is correct and the court cannot know which instruction influenced the jury.

***Banyard***, 47 So. 3d at 684 (quoting ***McHale***, 233 So. 2d at 769). Although Instruction C-16 was a proper instruction, the State did not offer any instruction modifying or clarifying the erroneous instruction. Therefore, the deficient instruction was not "cured" as claimed by the State, and we cannot deem the error harmless.

¶26. We recognize that the trial court simply followed the statute in approving the State's offered instruction. Nevertheless, the instruction constitutes plain error in this criminal proceeding. This definition should not be used in criminal trials. We reverse Count I for a new trial on whether Croft was "participating in or conducting or conspiring" in criminal gang activity beyond a reasonable doubt.

## II. Expert Testimony

¶27. Croft argues that the trial court erred by permitting the gang investigator, Ball, to offer an expert opinion. "A trial court's admission of testimony is reviewed for an abuse of discretion." ***Chaupette v. State***, 136 So. 3d 1041, 1045 (Miss. 2014) (quoting ***Foster v. Noel***,

12

715 So. 2d 174, 181 (Miss. 1998)). "'We give great deference to the discretion of the trial judge,' and 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, [the trial judge's] decision will stand.'" *Chaupette*, 136 So. 3d at 1045 (alteration in original) (quoting *United Am. Ins. Co. v. Merrill*, 978 So. 2d 613, 631 (Miss. 2007)).

¶28. The question before the Court is whether Ball testified only as a fact witness or whether his testimony included expert opinions governed by Mississippi Rule of Evidence 702. After review, we find that Ball's testimony was a combination of both.

¶29. "[A] fact witness may be virtually any competent person whose testimony is based on personal knowledge." *Crist v. Loyacono*, 65 So. 3d 837, 844 (Miss. 2011) (citing Miss. R. Evid. 601, 602). If a witness's testimony is in the form of an opinion and if the witness is not testifying as an expert, his or her testimony is limited to testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Miss. R. Evid. 701. "[I]f an opinion is based on scientific, technical, or other specialized knowledge, it can be admitted only under the guidance of Rule 702 as an expert opinion." *Chaupette*, 136 So. 3d at 1045-46 (citing Miss. R. Evid. 701). Mississippi Rule of Evidence 702 states that

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Miss. R. Evid. 702.

¶30. An opinion is based on specialized knowledge when "'the witness must possess some experience or expertise beyond that of the average randomly selected adult' to express the opinion." *Chaupette*, 136 So. 3d at 1046 (quoting *Langston v. Kidder*, 670 So. 2d 1, 3-4 (Miss. 1995)).

¶31. Portions of Ball's testimony were grounded in facts learned during his investigation of the shooting and based on his personal knowledge. For instance, Ball testified that Hall had identified "G-Money" as one of the shooters. Ball testified that Hall later positively identified Croft as "G-Money" and several other shooters from the Rolling 60s Crips Facebook page. He testified about the location of the shooting based on his investigation. Ball also testified about his personal knowledge of Croft's gang affiliation. We find that Ball testified as a fact witness during portions of his testimony under Mississippi Rule of Evidence 602, which provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Miss. R. Evid. 602.

¶32. However, Ball's testimony also included expert opinions under Mississippi Rule of Evidence 702. This testimony arose when Ball testified about Hall's gang membership *vel non*. Ball opined that he did not believe Hall was a member of any gang based on Hall's being a "hang-around" with members of a gang. When asked to clarify what a "hang-around" was, Ball testified, "[t]hat's somebody that hang around gang members. He was

14

hanging around in the area with some of them if they was friends or whatever. . . . He hung around with the BDs, Black Disciples, mostly on Valley and 33rd." We find that this portion of Ball's testimony was based on specialized knowledge under Mississippi Rule of Evidence 702, because an average, randomly selected adult likely would not be able to identify the Black Disciples or testify about the difference between a gang member and a "hang-around." *See Chaupette*, 136 So. 3d at 1046 (quoting *Langston*, 670 So. 2d at 3-4).

¶33. Additionally, Ball provided expert opinions about what he believed precipitated the shooting. The State asked Ball, "what, if anything, did you determine about this case and what prompted it?" Ball opined that a rivalry existed between the Rolling 60s Crips and the Black Disciples, based on his specialized knowledge that these gangs were always "beefing" with each other. Ball ultimately opined that the shooting was the result of a gang rivalry. These portions of Ball's testimony were based on his specialized knowledge, on-the-job training, and experience. Miss. R. Evid. 702. Again, an average person likely could not identify, much less distinguish between, the Black Disciples and the Rolling 60s Crips or testify about a rivalry between them. Indeed, the State spent much time questioning Ball about his qualifications as a gang investigator before questioning him about a gang rivalry. *See Langston*, 670 So. 2d at 4 ("[I]f a trial court must delve into a witness' background to determine if he possesses the necessary education, experience, knowledge or training in a specific field in order for the witness to testify as to his opinions concerning that particular field, then M.R.E. 702 applies." (citing *Hardy v. Brantley*, 471 So. 2d 358, 366 (Miss. 1985))).

¶34. The State argues that Ball was merely a lay witness under Mississippi Rule of Evidence 701 because his testimony was based on his personal observations of the facts gathered during his investigation and his "first-hand knowledge" obtained over several years working as a gang investigator in Meridian. The State's argument is without merit. Mississippi Rule of Evidence 703 specifically states that "an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Miss. R. Evid. 703. Simply because Ball's testimony relied on personal knowledge does not automatically place his testimony outside the scope of Rule 702. The critical inquiry is whether the witness's opinion testimony is based on scientific, technical, or other specialized knowledge . . . ." Miss. R. Evid. 701; Miss. R. Evid. 702. The portions of Ball's testimony concerning Hall's gang membership and his opinion about a gang rivalry were based on his specialized knowledge, experience, and training, and, therefore, the State was required to tender Ball as an expert for those portions of his testimony. *Chaupette*, 136 So. 3d at 1046 ("Before providing expert opinion testimony, a witness must be qualified, tendered, and accepted as an expert under Rule 702 of the Mississippi Rules of Evidence." (citing *Cotton v. State*, 675 So. 2d 308, 312 (Miss. 1996))). Notwithstanding, we find that the State's failure to do so in this case was harmless.

> Harmless-error analysis prevents "setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." We do not reverse a conviction for an erroneous evidentiary ruling unless "the error adversely affects a substantial right of a party," or in other words, unless the ruling prejudiced the accused. Thus, where it is "clear beyond a reasonable doubt that the error did not contribute to the verdict," we need not reverse the conviction.

16

*Collier v. State*, 183 So. 3d 885, 892 (Miss. 2016) (quoting *Smith v. State*, 136 So. 3d 424, 435 (Miss. 2014)).

¶35.    In *Chaupette*, the defendant argued on appeal that the trial court erred by allowing a physician to testify about diagnosing the victim as sexually abused, although the physician had not been tendered as an expert witness. *Chaupette*, 136 So. 3d at 1046. This Court reviewed the physician's testimony and found that "it was based on the patient history taken, as well as [the physician's] physical examination of [the victim]." *Id.* The Court concluded that the physician's testimony was "no doubt . . . based on her specialized knowledge, which can be presented only under the strictures of Rule 702." *Id.* However, this Court also found that the patient's history, which the physician had relied on, had been placed in evidence by five other witnesses. *Id.* at 1046-47. As a result, the Court held that any error in the admission of the physician's testimony regarding the diagnosis was harmless. *Id.* at 1047.

¶36.    The instant case is similar. Similar to *Chaupette*, the jury in this case heard testimony from Hall that Croft was a member of the Rolling 60s Crips. Hall also testified that he hung around the Black Disciples. Hall testified that he hung around people that Croft "had a problem with or had animosity with or had something going on with[.]" The victim offered testimony parallel to the improper expert testimony offered through Ball. A majority of this Court is unwilling to ignore Hall's testimony when presented with a harmless-error analysis.

¶37.    The jury also heard testimony from Kenza that the shooting was the result of a gang rivalry. Kenza testified that the shooting was prompted when his group observed Hall walking down the street wearing the color of a rival gang, the Hoover Crips. Kenza also

17

testified that he had attempted to shoot Hall "just because he was [Black Disciple]" and that he "wanted to . . . try to get some stripes off him" in order to advance to a higher rank in his own gang. Thus, although the State failed to tender Ball as an expert for the portions of his testimony based on his specialized knowledge, training, and experience, the error was harmless because those portions of Ball's testimony paralleled Hall's and Kenza's testimony. *Chaupette*, 136 So. 3d at 1046-47.

¶38. Finally, Ball's testimony did not have a likelihood of changing the result of the trial. *See Collier*, 183 So. 3d at 892. The victim's testimony that he was shot by Croft, who was a felon, is at odds with the dissent's rationale for reversing the remaining two counts—attempted murder and felon in possession of a firearm. We will not ignore the testimony of the victim when determining whether the State's failure to offer Ball as an expert witness is harmless error.

¶39. If the State chooses to call Ball as a witness when Count I is retried, the State should offer him not only as a fact witness but also as an expert witness under Rule 702 for the portions of his testimony that rely on his specialized knowledge.

¶40. Croft dedicates one sentence in his brief to argue that the State violated Mississippi Rule of Criminal Procedure 17.2(4) because Ball was not disclosed as an expert during discovery, even though Ball had been disclosed as the State's witness in discovery. Based on the holding in *Chaupette*, the State's failure to tender Ball as an expert was harmless error. *See Chaupette*, 136 So. 3d at 1045 (finding harmless error even though a State's

18

witness, who had not been tendered as an expert in discovery, had offered an expert opinion at trial).

### III.   Continuance

¶41.   Croft argues that the trial court erred in declining to grant him a continuance after learning that his codefendant, Kenza, had accepted a plea deal on the eve of trial and would testify as a witness for the State. Croft unconvincingly claims that Kenza's decision to testify unfairly surprised him, altered his trial strategy, left him without an adequate opportunity to prepare, and resulted in a manifest injustice. Croft additionally argues that the disclosure was untimely and amounted to a discovery violation.

¶42.   "This Court has often stated that the decision whether to grant or deny a continuance is a matter left to the sound discretion of the trial court." *Walker v. State*, 671 So. 2d 581, 592 (Miss. 1995) (citing *Johnson v. State*, 631 So. 2d 185, 189 (Miss. 1994)). "In considering whether the denial of the continuance was error, this Court has stated that 'the question of whether the defendant had a reasonable opportunity to prepare to confront the State's evidence at trial depends upon the particular facts and circumstances of each case.'" *Walker*, 671 So. 2d at 592 (quoting *Traylor v. State*, 582 So. 2d 1003, 1006 (Miss. 1991)). "Unless manifest injustice is evident from the denial of a continuance, this Court will not reverse." *Walker*, 671 So. 2d at 592 (citing *Johnson*, 631 So. 2d at 189).

¶43.   "Judicial analyses on this subject are necessarily fact intensive." *Fulks v. State*, 18 So. 3d 803, 805 (Miss. 2009). The trial judge summarized the facts surrounding the denial of Croft's motion for a continuance as follows:

19

There is a situation where there were multiple Defendants, and Mr. Croft says, [l]ook, the other Defendants aren't ready to go to trial and they've got issues, but I am, and I demand a speedy trial. And I agreed with him. I said, [y]ou're entitled to a speedy trial. And I told the State, I don't care that other codefendants aren't ready. Mr. Croft is in jail. He wants a trial, and he's entitled to a trial. Y'all proceed with it even though it might cost the State more trouble to have multiple trials. I'm not going to have somebody sit in jail for almost two years and through no fault of his own not have a trial. So I directed that the trial be conducted, and the trial is what we've had here today. And Mr. Croft through his motions and things has pressed the matter to be done. I want it done, and I want it done now. And I got it—you know, I required the State to proceed, and now to ask me to grant a mistrial because the Defendant is surprised about witnesses or just—whatever inconvenience it may have been had I think doesn't rise to the level of a mistrial. Certainly, in this case it's—what was unusual, and it wasn't unexpected, but a codefendant has decided that he would take a plea offer, and part of that plea offer was to testify in this case. And he didn't make that decision until Tuesday night about 5:00. There was a statement that was given by his attorney the next morning before we actually started voir dire in the case, and I directed that that statement be given to the State as well as to Mr. Wilson. They got it at the same time. I also directed that Mr. Wilson have an opportunity to interview and consult with this codefendant Woodard before his testimony. I gave him the time he requested plus some . . . .

¶44. The trial court recognized that the State and Croft received Kenza's statement at the same time, and Croft was given more time than he requested to interview Kenza before his testifying. Further, the trial court recognized that it was not unexpected that Kenza might testify at trial. Indeed, Kenza was Croft's codefendant who had been scheduled—for more than one year—to be tried alongside Croft.[2] Ever present was the possibility that Kenza, Croft's codefendant, might exercise his right to testify at trial when they were scheduled to be tried together. *See* Miss. Const. art. 3, § 26 ("In all criminal prosecutions the accused

---

[2] Trial was initially set for Croft, Kenza, and Johnson on June 1, 2016. The men were scheduled to be tried together until the trial court granted Croft's motion to sever on August 1, 2017. Croft's trial was held on August 24, 2017.

20

shall have a right to be heard be himself or counsel, or both . . . .") Kenza's decision to testify cannot be deemed an "unfair surprise" to Croft. *See Surprise*, Websters II New College Dictionary (2001) ("1. To encounter suddenly or unexpectedly: catch unaware[] . . . 3. To cause to feel wonder or astonishment . . . ."). Further, the record reflects that Croft's trial attorney believed that Kenza had been listed in discovery as a witness. When Croft learned that Kenza was going to testify, Croft's attorney stated, "[a]nd while we're on the Motions in Limine and discovery issues, we listed as a potential witness Mr. – I believe we had listed Mr. Kenzavion Woodard. It's come to my attention that he is going to testify for the prosecution." Croft's claim that he was unfairly surprised by Kenza's decision to testify is unsupported by the record.

¶45. As this Court has repeatedly recognized, "[i]n considering whether the denial of the continuance was error, this Court has stated that 'the question of whether the defendant had a reasonable opportunity to prepare to confront the State's evidence at trial depends upon the particular facts and circumstances of each case.'" *Walker*, 671 So. 2d at 592 (quoting *Traylor*, 582 So. 2d at 1006). Under the particular facts and circumstances of this case, Croft had a reasonable opportunity to prepare to confront Kenza, his codefendant, who had been scheduled for more than one year to be tried alongside him. Accordingly, we find that the trial court did not abuse its discretion in denying Croft's motion for a continuance. *See Walker*, 671 So. 2d at 592.

¶46. Croft additionally argues that the State committed a discovery violation even though the State and Croft received the statement at the same time. We discern no discovery

21

violation by the State. It is undisputed that the State did not have Kenza's statement in its possession, custody, or control until both parties received it.[3] Assuming *arguendo* that the State possessed the statement but failed to disclose it under Rule 17.2(1), the trial court properly followed Mississippi Rule of Criminal Procedure 17.9(a), which sets forth the procedures that a trial court must follow when it discovers that the State has failed to comply with discovery requests prior to trial.[4] The trial court gave Croft time to interview Kenza and to obtain his statement prior to trial. Additionally, the trial court allowed Croft to subpoena two other witnesses who had already been disclosed in discovery and who were in the

---

[3] Mississippi Rule of Criminal Procedure 17.2(1) states

Subject to the exceptions of Rule 17.6(a) and 17.7, the prosecution must disclose to each defendant or to the defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order, the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:

(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement (written, recorded or otherwise preserved) of each such witness and the substance of any oral statement made by any such witness[.]

MRCrP 17.2(1).

[4] Mississippi Rule of Criminal Procedure 17.9(a) states

If, at any time prior to trial, it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.

MRCrP 17.9(a).

courtroom awaiting trial. Yet Croft failed to have the witnesses served or to offer them as witnesses. This issue is without merit.

## CONCLUSION

¶47. The instruction permitting the jury to find an element of Count I by a preponderance of the evidence constitutes plain error. Accordingly, we reverse Count I and remand for a new trial on that count. Further, the State's failure to offer Ball as an expert under Mississippi Rule of Evidence 702 constitutes harmless error; however, if Ball is called as a witness on the retrial of this matter, the State should offer him as an expert for the portions of his testimony relating to his specialized knowledge. Finally, the trial court did not abuse its discretion in declining to grant Croft a continuance, and the State did not commit a discovery violation. We affirm Croft's convictions on Counts II and III.

¶48. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶49. While I agree with this Court's finding that the jury instruction constituted plain error and requires reversal, I disagree with the majority's finding that the expert testimony of Investigator Anthony Ball resulted in harmless error.[5]

--------------------------------

[5]In addition to the jury instruction's stating an incorrect standard of proof, the instruction provided,

> [a]ny evidence reasonably tending to show or demonstrate, in law or in fact, the existence of or membership in any conspiracy, confederation or other

23

¶50.    The admission of expert testimony is left to the sound discretion of the trial judge. ***Roberts v. Grafe Auto Co. Inc.***, 701 So. 2d 1093, 1098 (Miss. 1997). "A witness must be qualified as an expert under [Mississippi Rule of Evidence] 702 if her testimony is such that the peculiar knowledge or information to be presented is not likely possessed by a layman." ***Hobgood v. State***, 926 So. 2d 847, 854 (Miss. 2006) (citing ***Crawford v. State***, 754 So. 2d 1211, 1215-16 (Miss. 2000)). If a witness is not testifying as an expert, Mississippi Rule of Evidence 701 limits the opinion to one that is

>    (a) rationally based on the witness's perception;

>    (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

>    (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

M.R.E. 701. "There is a bright line rule. That is, where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a [Mississippi Rule of Evidence] 702 opinion and not a Rule 701 opinion." ***Sample v. State***, 643 So. 2d 524, 529–30 (Miss. 1994) (citing ***Miss. Highway Comm'n v. Gilich***, 609 So. 2d 367, 377 (Miss. 1992)).

¶51.    Investigator Ball testified that he had been in law enforcement for twenty-two years and that he had been an investigator for the Meridian Police Department Gang Unit for four

---

association described herein, or probative of the existence of or membership in any such association, shall be admissible in any action or proceeding brought under the Criminal Street Gang Act of Mississippi.

Although the instruction tracks the wording of the statute, I note that this language also is inappropriate in a jury instruction.

24

years. Before the Meridian Police Department, Investigator Ball stated that he was employed with the East Mississippi Drug Task Force. He additionally testified that he attended the Mississippi Gang Association conference every year. Despite his experience involving law enforcement and the gang unit, Investigator Ball was never qualified and tendered as an expert witness.

¶52. However, Investigator Ball repeatedly was allowed to give expert opinion testimony. Investigator Ball stated that he did not think Marcus Hall was a member of a specific gang but that he knew Hall to be a "hang-around." He testified that a hang around was "somebody that hang [sic] around gang members." Investigator Ball stated that Hall hung around the Black Disciples ("BDs"). After Investigator Ball's testimony that Hall was a hang around, the prosecution's direct examination of Investigator Ball proceeded as follows:

> Q: Now, you testified earlier that you've got training and gang experience and that you also work gang cases here in Meridian. Can you tell the jury whether or not the people that are members or associated with [Black Disciples] are friends, rivals or otherwise of the Rolling 60s?
>
> A: They're not friends. They are rivals. They been – I don't quite understand what they beefing about all the time, but they just always into it.
> . . . .
>
> Q: Okay. And did you know Montrell Croft and the other people that were identified as the shooters in this case to be associated with any particular gang?
>
> A: Yes, [the Rolling] 60[s].
> . . . .
>
> Q: And as a gang investigator, was it common for y'all to keep up with and gather intel about who was associated with what gangs?
>
> A: Yes, we get out and talk to them.
> . . . .

25

Q: And was it common through those types of investigative techniques for you to determine who was associated with what gangs?

A: Yes.

Q: Were you able to determine what gang Montrell Croft was associated with?

A: Yes. They tell us what –

DEFENSE: Objection, your Honor. Hearsay.[6]

COURT: Did Montrell Croft ever tell you what gang he was associated with?

A: Sir, I have talked to Montrell Croft on several occasions, and he is firm – believe me, he will tell you he's a 60 Crip.

COURT: Okay. Objection's overruled.

Q: Based on your information of knowing that the victim, Marcus Hall, regularly associated with people that were BDs and knowing that Montrell Croft was a 60s; what, if anything, did you determine about this case and what prompted it?
. . . .

Q: [D]id you know what the motive was, or did you have any evidence to support your conclusions, or did you – or are you just guessing?
. . . .

A: It can be a guess or a theory that they was into it with the BDs and they thought Marcus was one and saw him walking down the road and ran up on him and shot him.
. . . .

---

[6] I additionally note that, although Montrell Croft's attorney did not object, Investigator Ball made several more statements involving hearsay. For example, Investigator Ball was allowed to testify that, "Mr. Hall was being taken away in the ambulance. And later on that night, I went to see Mr. Hall in the emergency room. And at that time where he stated that he had been shot, and a subject by the name of "G-Money" which I know him as Montrell Croft shot him." In addition, he testified, "[w]hat he – Mr. Hall stated to me was they was all around him. They had circled around him. All of them walked up on him." These statements were improper and should have been disallowed had Croft's attorney objected.

A: I've been in the gang unit since 2013.

COURT: So that's at least four years, and he had personal knowledge of Mr. Hall, had personal knowledge of Mr. Croft and their associations with various different gangs and the relationships between the gangs and the rivalries that are there, and I think he can draw conclusions based on his experience as a law enforcement officer. . . .

. . . .

Q: And I guess that's specifically what I want to get at. When you believe that a case is motivated by or as a result of a gang rivalry, I want you to explain to the jury why these cases are in your opinion, based on your experience as a gang investigator and based on your involvement in this case, motivated by criminal street gang activity?

A: First of all, I'd like to say that it's not illegal to be in a gang. It's illegal what the gangs do once they're together. In this particular case, you had a group of people got together and ran out and committed a felony by shooting a suspect in the middle of the road.

Q: And based on your investigation, everybody that you talked to and all the investigation that you did, did you believe that it was motivated as a result of this gang rivalry?

A: Yes, ma'am.

¶53.    I would find that Investigator Ball's testimony requires reversal. As this Court has stated, "[i]t is reversible error to allow expert testimony from a witness never qualified or tendered as an expert." *Cotton v. State*, 675 So. 2d 308, 312 (Miss. 1996) (citing *Robertson v. State*, 569 So. 2d 691, 696 (Miss. 1990)). The policy behind Rule 702 is to allow the opposing party "ample opportunity to challenge the witness' qualifications to render such opinion before the question soliciting opinion is posed in front of the jury." *Sample*, 643 So. 2d at 530. Here, Investigator Ball was allowed to testify that, in his opinion, the shooting was motivated by gang rivalry. He also testified that he thought Hall was shot because the Rolling

27

60s were "into it" with the BDs and that Croft thought Hall was a BD. Investigator Ball did not have firsthand knowledge of the shooting or of the reasons why it occurred. Yet, clearly his testimony was an expert's opinion on specific aspects of gangs, on gang affiliation, and on the possible motive of the shooting.

¶54.   I disagree with the majority's contention that, because portions of Investigator Ball's testimony mirrored Hall's and Kenza's testimony, Investigator Ball's improper expert testimony was harmless. Although Hall testified that Croft was associated with the Rolling 60s, he did not state that Croft had any issues with the BDs. Hall stated that he was not associated with a gang but that he had friends that were BD members. He testified that he did not know what BD stood for. Hall then said that he had never had any type of confrontation or trouble with Croft and had no reason to believe that Croft had any animosity or hostility toward him. Later in his testimony, Hall stated that he guessed he hung around people that Croft had "a problem with or had animosity with or had something going on with them." However, Hall did not testify that the people that Croft might have had a problem with were BDs.

¶55.   In addition, Kenza's testimony as a codefendant was unreliable and was a condition to his plea deal. In exchange for his testimony, Kenza would be released from jail two months after the trial. Moreover, Kenza initially testified that the Hoover Crips and the Rolling 60s had "beef" with each other. He stated that the group followed Hall because Hall had been wearing an orange shirt and that the group thought that he was a Hoover Crip. Kenza later testified that he was personally attempting to shoot at Hall "just because he was

28

a BD, and I just wanted to probably try to get some stripes off on him." He then testified that he had never seen Hall at a BD meeting, but he thought he was a BD "because I – because I could just – when my gang member have beef with somebody, I also have beef with them too. If I never seen them before, I just take their word like he was a BD."[7] Thus, Kenza did not state that the BDs and the Rolling 60s were at odds with each other or that Croft had beef with the BDs. Kenza instead testified that after realizing that Hall was not a member of the Hoover Crips, he personally shot at Hall because he thought Hall was a BD and wanted to get "stripes off on him."

¶56.   Further, Investigator Ball testified before Kenza testified. Therefore, he was not merely corroborating or supplementing Kenza's testimony. Instead, Investigator Ball, after establishing his specialized knowledge and training in gang units, introduced the theory that, because the Rolling 60s and the BDs continually had a "beef" with each other, Hall was shot. And before questioning Investigator Ball about whether a rivalry existed between the BDs and the Rolling 60s, the prosecution reiterated that Investigator Ball had training, gang experience, and that he had worked gang cases in Meridian. "Yet, '[a] lay witness's unique qualifications have no bearing on the witness's ability to give a lay opinion.'" *Collins v. State*, 172 So. 3d 724, 744 (Miss. 2015) (quoting *Heflin v. Merrill*, 154 So. 3d 857, 863 (Miss. 2014)).

---

[7]On cross-examination, Kenza stated that he knew Hall was a BD. However, on redirect, Kenza clarified and stated that he had no personal knowledge that Hall was a BD; he just knew because "it's all over Facebook he hang with a whole lot of BDs."

¶57. Only Investigator Ball's expert testimony established a connection between the BDs and the Rolling 60s. "Because the public hold[s] police officers in great trust, the potential harm to the objecting party requires reversal where a police officer gives expert testimony without first being qualified as such." ***Roberts***, 701 So. 2d at 1099; *cf.* ***People v. McCain***, 177 A.D.2d 513, 514 (N.Y. App. Div. 1991) ("Furthermore, the court neglected to instruct the jury that in evaluating the credibility of the police officers who testified at trial, the testimony of these officers is to be accorded no greater weight than that of any other witness. Clearly, such a charge should be given . . . to help the jury accurately evaluate the credibility of these witnesses."). Investigator Ball's status as a police officer and a member of the gang unit was intended to and likely did hold great sway with the jury. *See* ***Collins***, 172 So. 3d at 744 ("Additionally, Detective Sims, as a police officer, held the public trust, and his giving expert testimony without being qualified as such was particularly harmful to Collins."). Therefore, his improper expert testimony should not be considered harmless error.

¶58. Croft had neither the benefit of pretrial disclosure of Investigator Ball's expert testimony nor the basis of his opinion, and Croft had no opportunity to evaluate Investigator Ball's testimony in advance of trial. I would find that the trial court abused its discretion in allowing Investigator Ball to give his in-depth, expert opinions on gang affiliations and the possible motive behind the shooting. Accordingly, I would reverse Croft's convictions *in toto* and would remand his case for a new trial.

**KITCHENS, P.J., JOINS THIS OPINION.**